## UNITED STATES *v.* BELMONT ET AL., EXECUTORS.

No. 532. Argued March 4, 1937.—Decided May 3, 1937.

*Solicitor General Reed* and *Mr. David E. Hudson,* with whom *Messrs. W. W. Scott, A. H. Feller, Albert Levitt,* and *Paul A. Sweeney* were on the brief, for the United States.

*Mr. Cornelius W. Wickersham* for respondents.

By leave of Court, briefs of *amici curiae* were filed by *Messrs. Samson Selig* and *Joseph Day Lee,* on behalf of John R. Crews, Receiver; *Messrs. Robert J. Sykes* and *William C. Morris,* on behalf of the President and Directors of the Manhattan Co.; and *Mr. Borris M. Komar,* on behalf of the Day-Gormley Leather Co., all urging affirmance of the decree below.

MR. JUSTICE SUTHERLAND delivered the opinion of the Court.

This is an action at law brought by petitioner against respondents in a federal district court to recover a sum of money deposited by a Russian corporation (Petrograd

Metal Works) with August Belmont, a private banker doing business in New York City under the name of August Belmont & Co. August Belmont died in 1924; and respondents are the duly-appointed executors of his will. A motion to dismiss the complaint for failure to state facts sufficient to constitute a cause of action was sustained by the district court, and its judgment was affirmed by the court below. 85 F. (2d) 542. The facts alleged, so far as necessary to be stated, follow.

The corporation had deposited with Belmont, prior to 1918, the sum of money which petitioner seeks to recover. In 1918, the Soviet Government duly enacted a decree by which it dissolved, terminated and liquidated the corporation (together with others), and nationalized and appropriated all of its property and assets of every kind and wherever situated, including the deposit account with Belmont. As a result, the deposit became the property of the Soviet Government, and so remained until November 16, 1933, at which time the Soviet Government released and assigned to petitioner all amounts due to that government from American nationals, including the deposit account of the corporation with Belmont. Respondents failed and refused to pay the amount upon demand duly made by petitioner.

The assignment was effected by an exchange of diplomatic correspondence between the Soviet Government and the United States. The purpose was to bring about a final settlement of the claims and counterclaims between the Soviet Government and the United States; and it was agreed that the Soviet Government would take no steps to enforce claims against American nationals; but all such claims were released and assigned to the United States, with the understanding that the Soviet Government was to be duly notified of all amounts realized by the United States from such release and assignment. The assignment and requirement for notice

are parts of the larger plan to bring about a settlement of the rival claims of the high contracting parties. The continuing and definite interest of the Soviet Government in the collection of assigned claims is evident; and the case, therefore, presents a question of public concern, the determination of which well might involve the good faith of the United States in the eyes of a foreign government. The court below held that the assignment thus effected embraced the claim here in question; and with that we agree.

That court, however, took the view that the situs of the bank deposit was within the State of New York; that in no sense could it be regarded as an intangible property right within Soviet territory; and that the nationalization decree, if enforced, would put into effect an act of confiscation. And it held that a judgment for the United States could not be had, because, in view of that result, it would be contrary to the controlling public policy of the State of New York. The further contention is made by respondents that the public policy of the United States would likewise be infringed by such a judgment. The two questions thus presented are the only ones necessary to be considered.

*First.* We do not pause to inquire whether in fact there was any policy of the State of New York to be infringed, since we are of opinion that no state policy can prevail against the international compact here involved.

This court has held, *Underhill* v. *Hernandez,* 168 U. S. 250, that every sovereign state must recognize the independence of every other sovereign state; and that the courts of one will not sit in judgment upon the acts of the government of another, done within its own territory.

That general principle was applied in *Oetjen* v. *Central Leather Co.,* 246 U. S. 297, to a case where an action in replevin had been brought in a New Jersey state court to recover a consignment of hides purchased in Mexico from

General Villa. The title of the purchaser was assailed on the ground that Villa had confiscated the hides. Villa, it appeared, had seized the hides while conducting independent operations under the Carranza government, which at the time of the seizure had made much progress in its revolution in Mexico. The government of the United States, after the trial of the case in the state court, had recognized the government of Carranza, first as the *de facto* government of the Republic of Mexico, and later as the government *de jure*. This court held that the conduct of foreign relations was committed by the Constitution to the political departments of the government, and the propriety of what may be done in the exercise of this political power was not subject to judicial inquiry or decision; that who is the sovereign of a territory is not a judicial question, but one the determination of which by the political departments conclusively binds the courts; and that recognition by these departments is retroactive and validates all actions and conduct of the government so recognized from the commencement of its existence. "The principle," we said, p. 303, "that the conduct of one independent government cannot be successfully questioned in the courts of another is as applicable to a case involving the title to property brought within the custody of a court, such as we have here, as it was held to be to the cases cited, in which claims for damages were based upon acts done in a foreign country, for it rests at last upon the highest considerations of international comity and expediency. To permit the validity of the acts of one sovereign State to be reëxamined and perhaps condemned by the courts of another would very certainly 'imperil the amicable relations between governments and vex the peace of nations.'" *Ricaud* v. *American Metal Co.*, 246 U. S. 304, 308–309, 310, is to the same effect.

In *A. M. Luther* v. *James Sagor & Co.*, L. R. [1921] 3 K. B. 532, the English Court of Appeal expressly ap-

proved and followed our decision in the *Oetjen* case. The English case involved that part of the same decree of the Soviet Government here under consideration which declared certain private woodworking establishments to be the property of the Republic. Under that decree the Government seized plaintiff's factory in Russia together with a stock of wood therein. Agents of the Republic sold a quantity of the stock so seized to the defendants, who imported it into England. Thereafter, the British Government recognized the Soviet Government as the *de facto* government of Russia. Upon these facts, the court held that, the British Government having thus recognized the Soviet Government, existing at a date before the decree in question, the validity of that decree and the sale of the wood to the defendants could not be impugned, and gave judgment for defendants accordingly. The court regarded the decree as one of confiscation, but was unable to see (Bankes, L. J., p. 546) how the courts could treat the decree "otherwise than as the expression by the de facto government of a civilized country of a policy which it considered to be in the best interest of that country. It must be quite immaterial for present purposes that the same views are not entertained by the Government of this country, are repudiated by the vast majority of its citizens, and are not recognized by our laws." Lord Justice Scrutton, in his opinion, discusses (pp. 557–559) the contention that the courts should refuse to recognize the decree and the titles derived under it as confiscatory and unjust, and concludes that the question is one not for the judges but for the action of the sovereign through his ministers. "I do not feel able," he said, "to come to the conclusion that the legislation of a state recognized by my Sovereign as an independent sovereign state is so contrary to moral principle that the judges ought not to recognize it. The responsibility for recognition or non-recognition with the consequences of each rests on the

political advisers of the Sovereign and not on the judges."
Further citation of authority seems unnecessary.

We take judicial notice of the fact that coincident with
the assignment set forth in the complaint, the President
recognized the Soviet Government, and normal diplomatic
relations were established between that government and
the Government of the United States, followed by an ex-
change of ambassadors. The effect of this was to validate,
so far as this country is concerned, all acts of the Soviet
Government here involved from the commencement of
its existence. The recognition, establishment of diplo-
matic relations, the assignment, and agreements with re-
spect thereto, were all parts of one transaction, resulting
in an international compact between the two govern-
ments. That the negotiations, acceptance of the assign-
ment and agreements and understandings in respect
thereof were within the competence of the President may
not be doubted. Governmental power over internal af-
fairs is distributed between the national government and
the several states. Governmental power over external
affairs is not distributed, but is vested exclusively in the
national government. And in respect of what was done
here, the Executive had authority to speak as the sole
organ of that government. The assignment and the agree-
ments in connection therewith did not, as in the case of
treaties, as that term is used in the treaty making clause
of the Constitution (Art. II, § 2), require the advice and
consent of the Senate.

A treaty signifies "a compact made between two or
more independent nations with a view to the public wel-
fare." *Altman & Co.* v. *United States,* 224 U. S. 583,
600. But an international compact, as this was, is not
always a treaty which requires the participation of the
Senate. There are many such compacts, of which a pro-
tocol, a modus vivendi, a postal convention, and agree-

ments like that now under consideration are illustrations. See 5 Moore, Int. Law Digest, 210–221. The distinction was pointed out by this court in the *Altman* case, *supra,* which arose under § 3 of the Tariff Act of 1897, authorizing the President to conclude commercial agreements with foreign countries in certain specified matters. We held that although this might not be a treaty requiring ratification by the Senate, it was a compact negotiated and proclaimed under the authority of the President, and as such was a "treaty" within the meaning of the Circuit Court of Appeals Act, the construction of which might be reviewed upon direct appeal to this court.

Plainly, the external powers of the United States are to be exercised without regard to state laws or policies. The supremacy of a treaty in this respect has been recognized from the beginning. Mr. Madison, in the Virginia Convention, said that if a treaty does not supersede existing state laws, as far as they contravene its operation, the treaty would be ineffective. "To counteract it by the supremacy of the state laws, would bring on the Union the just charge of national perfidy, and involve us in war." 3 Elliot's Debates 515. And see *Ware* v. *Hylton,* 3 Dall. 199, 236–237. And while this rule in respect of treaties is established by the express language of cl. 2, Art. VI, of the Constitution, the same rule would result in the case of all international compacts and agreements from the very fact that complete power over international affairs is in the national government and is not and cannot be subject to any curtailment or interference on the part of the several states. Compare *United States* v. *Curtiss-Wright Export Corp.,* 299 U. S. 304, 316, *et seq.* In respect of all international negotiations and compacts, and in respect of our foreign relations generally, state lines disappear. As to such purposes the State of New York does not exist. Within the field of its powers, what-

ever the United States rightfully undertakes, it necessarily has warrant to consummate. And when judicial authority is invoked in aid of such consummation, state constitutions, state laws, and state policies are irrelevant to the inquiry and decision. It is inconceivable that any of them can be interposed as an obstacle to the effective operation of a federal constitutional power. Cf. *Missouri* v. *Holland,* 252 U. S. 416; *Asakura* v. *Seattle,* 265 U. S. 332, 341.

*Second.* The public policy of the United States relied upon as a bar to the action is that declared by the Constitution, namely, that private property shall not be taken without just compensation. But the answer is that our Constitution, laws and policies have no extraterritorial operation, unless in respect of our own citizens. Compare *United States* v. *Curtiss-Wright Export Corp., supra,* at p. 318. What another country has done in the way of taking over property of its nationals, and especially of its corporations, is not a matter for judicial consideration here. Such nationals must look to their own government for any redress to which they may be entitled. So far as the record shows, only the rights of the Russian corporation have been affected by what has been done; and it will be time enough to consider the rights of our nationals when, if ever, by proper judicial proceeding, it shall be made to appear that they are so affected as to entitle them to judicial relief. The substantive right to the moneys, as now disclosed, became vested in the Soviet Government as the successor to the corporation; and this right that government has passed to the United States. It does not appear that respondents have any interest in the matter beyond that of a custodian. Thus far no question under the Fifth Amendemnt is involved.

It results that the complaint states a cause of action and that the judgment of the court below to the contrary is erroneous. In so holding, we deal only with the case

as now presented and with the parties now before us. We do not consider the status of adverse claims, if there be any, of others not parties to this action. And nothing we have said is to be construed as foreclosing the assertion of any such claim to the fund involved, by intervention or other appropriate proceeding. We decide only that the complaint alleges facts sufficient to constitute a cause of action against the respondents.

*Judgment reversed.*

MR. JUSTICE STONE, concurring.

I agree with the result, but I am unable to follow the path by which it is reached. Upon the record before us there is, I think, no question of reëxamining the validity of acts of a foreign state, and no question of the United States' declaring and enforcing a policy inconsistent with one that the State of New York might otherwise adopt in conformity to its own laws and the Constitution.

The United States, by agreement with the Soviet government, has acquired an assignment of all the rights of the latter in a chose in action, against an American citizen, formerly belonging to a Russian national, and confiscated by decree of the Soviet government. If the subject of the transfer were a chattel belonging to an American, but located in Russia, we may assume that the validity of the seizure would be recognized here, *Oetjen* v. *Central Leather Co.*, 246 U. S. 297; *Ricaud* v. *American Metal Co.*, 246 U. S. 304, 308–310; *Salimoff & Co.* v. *Standard Oil Co.*, 262 N. Y. 220; 186 N. E. 679. Similarly, the confiscation of the present claim, being lawful where made, is upon familiar principles to be regarded as effective in New York, except in so far as that state, by reason of the presence of the debtor there, may adopt and enforce a policy based upon non-recognition of the transfer.

But this Court has often recognized that a state may refuse to give effect to a transfer, made elsewhere, of property which is within its own territorial limits, if the transfer is in conflict with its public policy. *Green* v. *Van Buskirk,* 5 Wall. 307, 311–312; *Hervey* v. *Rhode Island Locomotive Works,* 93 U. S. 664; *Security Trust Co.* v. *Dodd, Mead & Co.,* 173 U. S. 624; *Clark* v. *Williard,* 292 U. S. 112, 122; *Clark* v. *Williard,* 294 U. S. 211. It is likewise free to disregard the transfer where the subject of it is a chose in action due from a debtor within the state to a foreign creditor, especially where, as in the present case, the debtor's only obligation is to pay within the state, on demand. *Harrison* v. *Sterry,* 5 Cranch 289; *Disconto Gesellschaft* v. *Umbreit,* 208 U. S. 570; *Barth* v. *Backus,* 140 N. Y. 230; 35 N. E. 425; *Vladikavkazsky Ry. Co.* v. *New York Trust Co.,* 263 N. Y. 369, 378–379; 189 N. E. 456. The chose in action is so far within the control of the state as to be regarded as located there for many purposes. *Wyman* v. *Halstead,* 109 U. S. 654, 656; *Chicago, R. I. & P. Ry. Co.* v. *Sturm,* 174 U. S. 710; *Harris* v. *Balk,* 198 U. S. 215; *Pennington* v. *Fourth National Bank,* 243 U. S. 269; *Security Savings Bank* v. *California,* 263 U. S. 282, 285; *Corn Exchange Bank* v. *Coler,* 280 U. S. 218; *In re Russian Bank for Foreign Trade,* L. R. 1933, Ch. Div. 745, 767; American Law Institute, Restatement, Conflict of Laws, §§ 108, 213.

It does not appear that the State of New York, at least since our diplomatic recognition of the Soviet government, has any policy which would permit a New York debtor to question the title of that government to a claim of the creditor acquired by its confiscatory decree, and no reason is apparent for assuming that such is its policy. Payment of the debt to the United States as transferee will discharge the debtor and impose on him no burden which he did not undertake when he assumed the position of debtor. Beyond this he has no interest for the state

to protect. But it is a recognized rule that a state may rightly refuse to give effect to external transfers of property within its borders so far as they would operate to exclude creditors suing in its courts. *Harrison* v. *Sterry, supra; Security Trust Co.* v. *Dodd, Mead & Co., supra; Disconto Gesellschaft* v. *Umbreit, supra; Clark* v. *Williard, supra; Barth* v. *Backus, supra.*

We recently held, in *Clark* v. *Williard, supra,* that the full faith and credit clause does not preclude the attachment of property within the state, by a local creditor of a foreign corporation, all of whose property has been previously transferred, in the state of its incorporation, to a statutory successor for the benefit of creditors. Due process under the Fifth Amendment, the benefits of which extend to alien friends, as well as to citizens, *Russian Volunteer Fleet* v. *United States,* 282 U. S. 481, does not require any different result. *Disconto Gesellschaft* v. *Umbreit, supra,* 579, 580. The Constitution has no different application where the property transferred is a chose in action, later seized by a creditor in the state of the debtor. *Disconto Gesellschaft* v. *Umbreit, supra.* See *Harrison* v. *Sterry, supra.* In conformity to this doctrine, New York would have been free to enforce a local policy, subordinating the Soviet government, as the successor of its national, to local suitors. Its judicial decisions indicate that such may be its policy for the protection of creditors or others claiming an interest in the sum due. *James & Co.* v. *Second Russian Insurance Co.,* 239 N. Y. 248, 257; 146 N. E. 369; *Matter of People* (City Equitable Fire Insurance Co.), 238 N. Y. 147, 152; 144 N. E. 484; *Matter of Waite,* 99 N. Y. 433, 448; 2 N. E. 440. See *Vladikavkazsky Ry. Co.* v. *New York Trust Co., supra.*

It seems plain that, so far as now appears, the United States does not stand in any better position with respect to the assigned claim than did its assignor, or any other

transferee of the Soviet government. We may, for present purposes, assume that the United States, by treaty with a foreign government with respect to a subject in which the foreign government has some interest or concern, could alter the policy which a state might otherwise adopt. It is unnecessary to consider whether the present agreement between the two governments can rightly be given the same effect as a treaty within this rule, for neither the allegations of the bill of complaint, nor the diplomatic exchanges, suggest that the United States has either recognized or declared that any state policy is to be overridden.

So far as now relevant, the document signed by the Soviet government, as preparatory to a more general settlement of claims and counterclaims between the two governments, assigns and releases to the United States all amounts "due or that may be found to be due it" from American nationals, and provides that the Soviet government is "to be duly notified in each case of any amount realized by the Government of the United States from such release and assignment." The relevant portion of the document signed by the President is expressed in the following paragraph:

"I am glad to have these undertakings by your Government and I shall be pleased to notify your Government in each case of any amount realized by the Government of the United States from the release and assignment to it of the amounts admitted to be due or that may be found to be due."

There is nothing in either document to suggest that the United States was to acquire or exert any greater rights than its transferor, or that the President, by mere executive action, purported or intended to alter the laws and policy of any state in which the debtor of an assigned claim might reside, or that the United States, as assignee,

is to do more than the Soviet government could have done after diplomatic recognition—that is, collect the claims in conformity with those laws. Cf. *Todok* v. *Union State Bank*, 281 U. S. 449.

As respondent debtor may not challenge the effect of the assignment to the United States, the judgment is rightly reversed. But as the reversal is without prejudice to the rights of any other parties to intervene, they should be left free to assert, by intervention or other appropriate procedure, such claims with respect to the amount due as are in accordance with the laws and policy of New York. There is no occasion to say anything now which can be taken to foreclose the assertion by such claimants of their rights under New York law.

MR. JUSTICE BRANDEIS and MR. JUSTICE CARDOZO concur in this opinion.