**REPUBLIC OF IRAQ, Appellant,**

v.

**FIRST NATIONAL CITY BANK, as Administrator of the Goods, Chattels and Credits of His Majesty King Faisal II Ibn Ghazi Ibn Faisal I of Iraq, deceased, Appellee.**

**No. 102, Docket 29817.**

United States Court of Appeals Second Circuit.

Argued Oct. 1, 1965.

Decided Nov. 8, 1965.

Certiorari Denied Jan. 31, 1966.

See 86 S.Ct. 648.

Leo C. Fennelly, New York City (Fennelly, Douglas, Eagan, Nager & Voorhees, New York City; Edward P. F. Eagan, New York City, of counsel), for appellant.

Woodson D. Scott, New York City (Lord, Day & Lord, New York City), for appellee.

Before FRIENDLY and KAUFMAN, Circuit Judges, and HERLANDS, District Judge.*

FRIENDLY, Circuit Judge:

King Faisal II of Iraq was killed on July 14, 1958, in the midst of a revolution in that country which led to the establishment of a republic, recognized by the United States in August. On July 19, 1958, the new government issued Ordinance No. 23 which decreed that "all property [of the dynasty] * * * whether moveable or immoveable * * should be confiscated."[1] At the time of his death King Faisal had a balance of $55,925 and 4,008 shares of Canada General Fund, Ltd., a Canadian investment trust, in deposit and custody accounts with Irving Trust Company in New York. In October 1958, the Surrogate's Court for New York County issued to the defendant letters of administration with respect to King Faisal's New York assets.

---

* Of the Southern District of New York, sitting by designation.

1. The ordinance included the following preamble:

It is well known that the Iraqi Exdynasty has exerted its influence in Iraq to gain illegal wealth since its inception, as from 23rd August 1921. Consequently, in accordance with the aims of the National Movement that have been achieved by the Iraqi Army supported by the people of Iraq with their consent on 14th July, 1958, for the realization of social justice and putting an end to the illegal exploitation, we issue the following ordinance:—

During that month the Consul General of the Republic of Iraq notified Irving Trust that the Republic claimed all assets of King Faisal by virtue of Ordinance No. 23. Notwithstanding the notice, Irving Trust subsequently transferred to the administrator the balance in the account and certificates for the shares, which were later sold.

In March 1962, the Republic brought this action against the administrator in the District Court for the Southern District of New York to recover the bank balance and the proceeds of the shares. From a judgment dismissing the complaint, 241 F.Supp. 567 (1965), the Republic appeals. We affirm.

The District Court properly held that it had jurisdiction of the action. Under 28 U.S.C. § 1332(a) the district courts are vested with original jurisdiction of all civil actions "where the matter in controversy exceeds the sum or value of $10,000, exclusive of interest and costs, and is between * * * (2) citizens of a State, and foreign states or citizens or subjects thereof." Although this general language does not grant jurisdiction to probate a will or administer an estate, it has been established by a long series of decisions "that federal courts of equity have jurisdiction to entertain suits 'in favor of creditors, legatees and heirs' and. other claimants against a decedent's estate 'to establish their claims' so long as the federal court does not interfere with the probate proceedings or assume general jurisdiction of the probate or control of the property in the custody of the state court." Markham v. Allen, 326 U.S. 490, 494, 66 S.Ct. 296, 298, 90 L.Ed. 256 (1946), citing Waterman v. Canal-Louisiana Bank & Trust Co., 215 U.S. 33, 43, 30 S.Ct. 10, 54 L.Ed. 80 (1909), and other cases.

The principal questions raised in this appeal are the proper definition of the act of state doctrine and its application to foreign confiscation decrees purporting to affect property within the United States. Although difficulty is sometimes encountered in drawing the line between an "act of state" and more conventional foreign decrees or statutes claimed to be entitled to respect by the forum, the Ordinance involved in this case is nowhere near the boundary. A confiscation decree, which is precisely what Ordinance No. 23 purported to be, is the very archetype of an act of state. See ALI, Restatement of Foreign Relations Law of the United States § 41c (Proposed Official Draft, 1962) [hereinafter cited as Restatement].

The Supreme Court has declared that a question concerning the effect of an act of state "must be treated exclusively as an aspect of federal law." Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 423–427, 84 S.Ct. 923, 939, 11 L.Ed.2d 804 (1964). We deem that ruling to be applicable here even though, as we conclude below, this is not a case in which the courts of the forum are bound to respect the act of the foreign state. Like the traditional application of the act of state doctrine to preclude judgment with respect to another government's acts concerning property within its own territory at the time, see Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897); Oetjen v. Central Leather Co., 246 U.S. 297, 38 S.Ct. 309, 62 L.Ed. 726 (1918); Ricaud v. American Metal Co., 246 U.S. 304, 38 S. Ct. 312, 62 L.Ed. 733 (1918), the exercise of discretion whether or not to respect a foreign act of state affecting property in the United States is closely tied to our foreign affairs, with consequent need for nationwide uniformity. It is fundamental to our constitutional scheme that in dealing with other nations the country must speak with a united voice. See United States v. Belmont, 301 U.S. 324, 331, 57 S.Ct. 758, 81 L.Ed. 1134 (1937); United States v. Pink, 315 U.S. 203, 233–234, 62 S.Ct. 552, 86 L.Ed. 796 (1942). It would be baffling if a foreign act of state intended to affect property in the United States were ignored on one side of the Hudson but respected on the other; any such diversity between states would needlessly complicate the handling of the foreign relations of the United States. The required uniformity can

be secured only by recognizing the expansive reach of the principle, announced by Mr. Justice Harlan in Sabbatino, that all questions relating to an act of state are questions of federal law, to be determined ultimately, if need be, by the Supreme Court of the United States.[2]

 Under the traditional application of the act of state doctrine, the principle of judicial refusal of examination applies only to a taking by a foreign sovereign of property within its own territory, see Ehrenzweig, Conflict of Laws § 48 at 172 (1962); cf. Banco Nacional de Cuba v. Sabbatino, supra, 376 U.S. at 401, 428, 432, 84 S.Ct. 923; when property confiscated is within the United States at the time of the attempted confiscation, our courts will give effect to acts of state "only if they are consistent with the policy and law of the United States." Restatement § 46.

 In this case, neither the bank account nor the shares in the Canadian investment trust can realistically be considered as being within Iraq simply because King Faisal resided and was physically present there at the time of his death; in the absence of any showing that Irving Trust had an office in Iraq or would be in any way answerable to its courts, we need not consider whether the conclusion would differ if it did. Cf. United States v. First Nat'l City Bank, 379 U.S. 378, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965). So far as appears on this record, only a court in the United States could compel the bank to pay the balance in the account or to deliver the certificates it held in custody. The property here at issue thus was within the United States. Although the nationality of King Faisal provided a jurisdictional basis for the Republic of Iraq to prescribe a rule relating to his property outside Iraq, Restatement § 30(1) (b), this simply gives the confiscation decree a claim to consideration by the forum which, in the absence of such jurisdiction, it would not possess—not a basis for insisting on the absolute respect which, subject to the qualifications of Sabbatino, 376 U.S. at 428, 84 S.Ct. 923, the decree would enjoy as to property within Iraq at the time.

 Extra-territorial enforcement of the Iraqi ordinance as to property within the United States at the date of its promulgation turns on whether the decree is consistent with our policy and laws.[3] We perceive no basis for thinking it to be. Confiscation of the assets of a corporation has been said to be "contrary to our public policy and shocking to our sense of justice," Vladikavkazsky Ry. Co. v. New York Trust Co., 263 N.Y. 369, 378, 189 N.E. 456, 460, 91 A.L.R. 1426 (1934); see also Zwack v. Kraus Bros. & Co., 237 F.2d 255, 259 (2 Cir. 1956) (partnership); Plesch v. Banque Nationale de la République d'Haiti, 273 App.Div. 224, 77 N.Y.S.2d 43 (1st Dept.), aff'd, 298 N.Y. 573, 81 N.E.2d 106 (1948). Confiscation of the assets of an individual is no less so, even if he wears a crown. Compare Banco de Vizcaya v. Don Alfonso de Borbon y Austria, [1935] 1 K.B. 140. Our Constitution sets itself against

2. This law-making power in the federal courts derives by necessary inference from the Constitution itself. Compare Wright, Federal Courts 214 (1963); Friendly, In Praise of Erie—and of the New Federal Common Law, 39 N.Y.U.L.Rev. 408 n. 119 (1964); Henkin, The Foreign Affairs Power of the Federal Courts, 65 Colum. L.Rev. 805, 826–30 (1965).

3. It might be argued that, with respect to the shares in the Canadian investment trust, a United States court ought to consider whether a Canadian court would regard the confiscation decree as consistent with the policy of Canada. But, apart from factors tending against such an argument, see Ehrenzweig, supra, 84 & n. 52, appellant has not contended that the shares should be treated differently than the bank account, it has presented no evidence as to the attitude of Canada toward foreign confiscations, and although we could take judicial notice of Canadian decisions, see Siegelman v. Cunard White Star Ltd., 221 F.2d 189, 196–197 (2 Cir. 1955), we are not obliged to do so under these circumstances. See Walton v. Arabian American Oil Co., 233 F.2d 541 (2 Cir.), cert. denied, 352 U.S. 872, 77 S.Ct. 97, 1 L.Ed.2d 77 (1956); B. Currie, Selected Essays on the Conflict of Laws 26–27, 33, 43, 49–50 (1963).

confiscations such as that decreed by Ordinance No. 23 not only by the general guarantees of due process in the Fifth and Fourteenth Amendments but by the specific prohibitions of bills of attainder in Article I. See United States v. Brown, 381 U.S. 437, 85 S.Ct. 1707, 14 L.Ed.2d 484 (1965), and cases cited therein. It is true that since these provisions are addressed to action by the United States or a state, they might not prevent a court of the United States from giving effect to a confiscatory act of a foreign state with respect to property in the United States. But at least they show that, from its earliest days under the Constitution, this nation has had scant liking for legislative proscription of members of a defeated faction, although—or perhaps because—many states, in their dealings with property of the loyalists immediately after the Revolution, had practiced exactly that. See United States v. Brown, supra, 381 U.S. at 441–446, 85 S.Ct. 1707. Foreigners entrusting their property to custodians in this country are entitled to expect this historic policy to be followed save when the weightiest reasons call for a departure. In saying this we are not guilty of disrespect to the recitals in the preamble of Ordinance No. 23, see fn. 1; subject to the narrow exception discussed below, the policy of the United States is that there is no such thing as a "good" confiscation by legislative or executive decree.

The only cases cited to us that might seem to suggest a deviation from this view are United States v. Belmont, 301 U.S. 324, 57 S.Ct. 758 (1937), and United States v. Pink, 315 U.S. 203, 62 S.Ct. 552 (1942). Language in the latter opinion did indeed lead "some commentators to protest that the Court had laid down the revolutionary doctrine that recognition requires the recognizing state to give extraterritorial effect to all acts of state of the recognized government." Stevenson, Effect of Recognition on the Application of Private International Law Norms, 51 Colum.L.Rev. 710, 720 & n. 54 (1951); see Borchard, Extraterritorial Confiscations, 36 Am.J.Int'l L. 275 (1942); Jessup, The Litvinov Assignment and the Pink case, id. at 282. The facts of the cases, however, required no such overturn of established principles. By the Litvinov agreement our Government had procured, as an incident to recognition, an assignment of the Soviet Union's claims to American assets of nationalized Russian companies, for the benefit of United States nationals whose property in the Soviet Union had been confiscated. Such action of the Chief Executive, taken under his power to conduct the foreign relations of the United States, was considered to make the Soviet confiscation decrees consistent with the law and policy of the United States from that time forward, and, as we now know from Sabbatino, federal law controls. See Restatement § 46, comment (c) and the discussion of United States v. Pink.[4] In this case, by contrast, nothing remotely resembling the Litvinov agreement is present; on the contrary, the Department of State has disclaimed any interest of the executive department in the outcome of the litigation.[5]

---

4. It is also noteworthy that in Belmont the dispute was simply between the United States and a debtor of the nationalized Russian company, and in Pink between the United States, acting as assignee on behalf of American citizens who had suffered from the Russian confiscations, and foreign creditors. For the importance of the latter factor, see 315 U.S. at 228, 62 S.Ct. 552.

5. The Deputy Legal Adviser to the Department of State said in a letter dated January 15, 1965, to defendant's counsel:

 While the recognition of and maintenance of diplomatic relations with a foreign government are political matters within the province of the executive department of the Federal Government, questions regarding the administration of estates and the determination of rights and interests in property in the United States ordinarily are matters for determination by the courts of competent jurisdiction. Accordingly, the Department considers that the legal effect of Ordinance No. 23 as it may pertain to title to property in the United States of King Faisal II is a question for determination by the competent United States court.

■ Appellant insists that, however this may be, a New York court would give effect to Ordinance No. 23 because of the New York Decent Estate Law, McKinney's Consol.Laws, c. 13, § 47, which provides:

Except where special provision is otherwise made by law, the validity and effect of a testamentary disposition of any other property [i. e., other than real estate] situated within the state, and the ownership and disposition of such property, where it is not disposed of by will, are regulated by the laws of the state or country, of which the decedent was a resident, at the time of his death.

As already indicated, we read Sabbatino to mean that New York could not, by application of its choice of law rules, give a foreign act of state an effect, whether less or greater, differing from that dictated by federal law. But appellant's position would be baseless in any event. Not only does § 47 refer to the law existing at the time of decedent's death, but no state has been stronger in its opposition to foreign confiscation decrees than New York, see, e. g., Vladikavkazsky Ry. Co. v. New York Trust Co., supra; Plesch v. Banque Nationale de la République d'Haiti, supra. Indeed, it was this opposition that required the Supreme Court's intervention in the Pink case. We are thus confident that the courts of New York would not strain to read the general language of the Decedent Estate Law to include what on its face is a confiscation decree.

Since the district judge properly concluded the complaint to be lacking in merit, we do not reach the question whether dismissal would have been required in any event on the ground that a prior decree of the Surrogate's Court distributing the assets of the estate operated as *res judicata* despite the sovereign character of the Republic of Iraq and the pendency of this suit. See Restatement § 71, comment (e).[6]

Affirmed.

---

6. Another district judge had denied, on the ground of sovereign immunity, a motion by defendant to "transfer" this action to the Surrogate's Court, 207 F.Supp. 588 (1962), appeal dismissed for want of jurisdiction, 313 F.2d 194 (2 Cir. 1963). We know of no authority for such a "transfer"; the utmost relief to which defendant might have been entitled, even as against a private suitor, was a stay of the federal court action pending hearing and determination of the claim by the Surrogate's Court. Cf. Stansbury v. Koss, 10 F.Supp. 477 (S.D.N.Y.1931) (Mack, Cir. J.).