**UNITED BANK LIMITED, Plaintiff,**

v.

**COSMIC INTERNATIONAL, INC.,**
Defendant.

**JANATA BANK and Amin Jute Mills,**
**Ltd., Plaintiffs,**

v.

**COSMIC INTERNATIONAL, INC. and**
**Irving Trust Company,**
Defendants.

**SONALI BANK and Nishat Jute Mills,**
**Ltd., Plaintiffs,**

v.

**IRVING TRUST COMPANY and Cosmic**
International, Inc., Defendants.

**NISHAT JUTE MILLS, LTD. and National Bank of Pakistan, Plaintiffs,**

v.

**COSMIC INTERNATIONAL, INC.,**
Defendant.

Nos. 72 Civ. 5209–CLB, 73 Civ. 393–CLB, 73 Civ. 858–CLB, 73 Civ. 2736–CLB.

United States District Court,
S. D. New York.

March 31, 1975.

Nierenberg, Zeif & Weinstein, New York City, for Sonali Bank, Janata Bank, Amin Jute Mills, Ltd. and Nishat Jute Mills, Ltd.

Carter, Ledyard & Milburn, New York City, for United Bank Ltd. and Amin Jute Mills, Ltd.

Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for National Bank of Pakistan and Nishat Jute Mills Ltd.

Burlingham, Underwood & Lord, New York City, for Cosmic International Inc.

## MEMORANDUM DECISION

BRIEANT, District Judge.

With the consent of counsel, these cases were tried jointly before me on October 21, 1974. Two stipulations of fact dated June 27, 1974 and October 18, 1974 and a supplemental stipulation, also dated October 18, 1974, have been received. The facts recited below are taken from the stipulations unless otherwise indicated.

This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a). Plaintiffs in each case are aliens. The litigation is in the nature of an interpleader action, the stakeholder being Cosmic International, Inc., formerly known as "Pak-Am, Inc.", a Delaware corporation with its principal place of business in New York City ("Cosmic"). Cosmic holds the proceeds of sales to it of jute products made in and shipped from East Pakistan and received in the United States by Cosmic in 1971. Before payment was made by Cosmic, East Pakistan declared its independence from Pakistan and became Bangladesh, which has been recognized as an independent nation by the United States.

Nishat Jute Mills, Ltd., National Bank of Pakistan, Amin Jute Mills, Ltd. and United Bank Limited (the "Pakistani plaintiffs") contend the funds should be paid to them because the goods were delivered, and the right to receive payment arose in the United States, before Bangladesh achieved independence from

Pakistan and before its new government nationalized banks and jute mills and confiscated all property in Bangladesh belonging to Pakistani citizens. In addition, they claim these choses in action had no situs in Bangladesh.

Sonali Bank, Nishat Jute Mills, Ltd., Janata Bank and Amin Jute Mills, Ltd. (the "Bangladesh plaintiffs") claim the funds as successors to the Pakistani plaintiffs' property and assets under various Bangladesh nationalization orders. According to the Bangladesh plaintiffs, this Court must give effect to the nationalization orders under the act of state doctrine. The classic statement of that doctrine is found in Underhill v. Hernandez, 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897):

> "Every sovereign state is bound to respect the independence of every other sovereign state, and the courts of one country will not sit in judgment on the acts of the government of another, *done within its own territory.*" (Emphasis added)

■ Courts in the United States, both state and federal, may not inquire into the legality of the taking of property without compensation of Pakistan's citizens by the Bangladesh government if that property was in Bangladesh, and under the control of the Bangladesh government at the time of the taking. This is so even if such expropriations violated international law.

*Events in East Pakistan*

A "Proclamation of Independence" was issued in India on April 10, 1971 declaring that East Pakistan became the sovereign state of Bangladesh on March 26, 1971. The revolution began in the Spring of 1971, but most of East Pakistan continued under the control of Pakistan until Pakistani troops surrendered on December 16, 1971.

On February 28, 1972, the new government issued the "Bangladesh Abandoned Property (Control, Management and Disposal) Order, 1972", which decreed that all property owned by citizens of a state at war with Bangladesh after March 25, 1971 (i. e., Pakistan) was vested in the government of Bangladesh. There was no provision for compensation.

On March 26, 1972, the "Bangladesh Banks (Nationalisation) Order, 1972" and the "Bangladesh Industrial Enterprises (Nationalisation) Order, 1972" declared all shares of banks and industrial companies which had not already vested in the government under any other law immediately vested in the government as sole shareholder. Compensation was limited to the paid-up value of the shares. No compensation has been paid pursuant to these orders.

*Transactions Between Cosmic and Nishat*

Nishat Jute Mills, Ltd., incorporated under the laws of Pakistan in 1955 ("Nishat"), operated a mill for the manufacture of jute products in East Pakistan until the mill was nationalized in 1972. A new government-owned enterprise, Bangladesh Jute Mills Corporation, took over ownership and management of the mill.

From 1967 through 1970, Cosmic sold jute carpet backing for Nishat as its exclusive sales agent in the United States and Canada. After September 1970, Cosmic purchased carpet backing pursuant to individual purchase orders. This action concerns shipments of jute carpet backing loaded aboard five vessels at Chittagong, East Pakistan, between July 23, 1971 and November 1, 1971. All of the goods, bills of lading and related documents arrived in the United States before December 16, 1971, and the merchandise was resold before that date. Between September 7, 1971 and December 3, 1971, Cosmic accepted drafts drawn on it by Nishat, obligating it to pay $97,043.50 for the five shipments. Payment was to be made in New York City between March and May, 1972, to Irving Trust Company, acting as agent for Nishat's bank, National Bank of Pakistan ("National Bank"). The money was to be credited to National Bank's head office in Karachi, Pakistan, with notice to its Dacca, East Pakistan

branch office, the branch with which Nishat dealt.

At the time of these transactions, Nishat was indebted to National Bank in an amount exceeding $97,043.50. Had Cosmic paid National Bank, its Dacca office would have credited Nishat's account, reducing Nishat's indebtedness by the full amount received.

Because of the intervening events in East Pakistan and the conflicting claims of the Pakistani plaintiffs and the Bangladesh plaintiffs, Cosmic did not make payment, although it admits the debt.[1]

*Transactions Between Cosmic and Amin*

Amin Jute Mills, Ltd. ("Amin") was incorporated under the laws of Pakistan in 1953. It had a branch office in Karachi, Pakistan, with its principal office and its only jute mill in Chittagong, East Pakistan. All shares of stock and property of Amin located in East Pakistan when the new government came into power are now vested in Bangladesh Jute Mills Corporation.

This action concerns jute and hessian cloth purchased by Cosmic from Amin for a total of $433,365.96. The goods, bills of lading and related documents arrived in the United States before December 16, 1971, and the shipments were resold by Cosmic before that date.

Irving Trust Company, acting as Trustee pursuant to seven Trust Receipts dated August 11, 1971 through December 3, 1971, was to collect the purchase price in New York City and remit it to the Karachi, Pakistan, office of United Bank Limited ("United Bank"), and notify United Bank's branch at Chittagong, East Pakistan, the branch with which Amin dealt.

At the time of these transactions, Amin was indebted to United Bank in an amount in excess of $433,365.96. According to the agreement between United Bank and Amin, these funds could be paid over to Amin or used to reduce Amin's indebtedness to the Bank, as the Bank chose.[2]

Cosmic was to make payment to Irving Trust Company between February and June, 1972. Again, because of the events in East Pakistan and the claims being made by the respective plaintiffs, Cosmic did not pay, but admits the debt.[3]

■ From the foregoing facts, it is clear the sales transactions were complete and all that remained was the right to receive payment, which was to be made in New York City. This right existed before December 16, 1971, the date the new Bangladesh government gained control of East Pakistan. The act of state doctrine is inapplicable because the situs of the debts was New York at the time the Bangladesh government attempted to seize them.

The Supreme Court has stated that [*Banco Nacional de Cuba v. Sabbatino*,

1. A sum in excess of $97,043.50, representing the proceeds of the sight drafts with interest, is presently deposited with Irving Trust Company, subject to attachment by Sonali Bank and Nishat Jute Mills, pursuant to orders of this Court dated May 9 and May 23, 1972.

2. In an effort to obviate any difficulty that might result from this arrangement, Amin executed an Assignment dated May 22, 1973 to United Bank of any interest it might have in these funds. The Bangladesh plaintiffs question the authority of Amin's present shareholders and Board to act on its behalf. The stipulation entered into by the parties shows, however, that Amin is a viable Pakistani corporation and that even at the time its assets in East Pakistan were expropriated, most of its shareholders, a majority of its shares, as well as a majority of its Board, were in Pakistan. We have been cited to no authority from either nation for the proposition that the Bangladesh orders nationalizing Amin's property and shares in East Pakistan extinguished the Parkistan corporation or affected its ability to transact business in Pakistan.

3. The sum of $499,348.83, representing the proceeds of these sales with interest, is presently deposited with Irving Trust Company, subject to attachment by United Bank Limited pursuant to orders of this Court dated December 8, 1972, March 9 and May 23, 1973.

376 U.S. 398, 428, 84 S.Ct. 923, 940, 11 L.Ed.2d 804 (1963)]:

> "There are few if any issues in international law today on which opinion seems to be so divided as the limitations on a state's power to expropriate the property of aliens."

But the Supreme Court treated that issue as irrelevant, holding [*Banco Nacional, supra,* at 431, 84 S.Ct. at 942]:

> "The act of state doctrine is applicable even if international law has been violated."

There is no question that such an expropriation is "offensive to the public policy of this country and its constituent States." *Banco Nacional, supra,* at 436, 84 S.Ct. at 944. New York courts are in accord on this point; see Perutz v. Bohemian Discount Bank in Liquidation, 304 N.Y. 533, 110 N.E.2d 6 (1953); Vladikavkazsky Ry. Co. v. New York Trust Co., 263 N.Y. 369, 189 N.E. 456 (1934); Gonzales v. Industrial Bank (of Cuba), 12 N.Y.2d 33, 234 N.Y.S.2d 210, 186 N.E. 2d 410 (1962).

Of the many cases in which the act of state doctrine has been discussed since *Hernandez, supra,* two from our Court of Appeals bear directly on the issues presented here: Republic of Iraq v. First National City Bank, 353 F.2d 47 (2d Cir. 1965), cert. denied, 382 U.S. 1027, 86 S.Ct. 648, 15 L.Ed.2d 540, and Menendez v. Saks and Company, 485 F. 2d 1355 (2d Cir. 1973), cert. granted sub nom., Alfred Dunhill of London, Inc. v. Republic of Cuba, 416 U.S. 981, 94 S.Ct. 2382, 40 L.Ed.2d 758.

*Republic of Iraq, supra,* was a suit brought by the government of Iraq to recover money deposits and stock held by First National City Bank as administrator of the estate of King Faisal II of Iraq, who was killed in the 1958 revolution of Iraq. When the new government took control, it ordered confiscation of all property belonging to King Faisal, including property located outside of Iraq. The Court refused to give effect to that confiscatory decree, holding the confiscation contrary to the law and policy of the United States and unenforceable as to property located in the United States at the time of the promulgation of the decree. The Court held [353 F.2d at 51]:

> "Under the traditional application of the act of state doctrine, the principle of judicial refusal of examination applies only to a taking by a foreign sovereign of property within its own territory . . .; when property confiscated is within the United States at the time of the attempted confiscation, our courts will give effect to acts of state 'only if they are consistent with the policy and law of the United States.' Restatement [of Foreign Relations Law of the United States] § 46."

*Menendez, supra,* presently under consideration by the Supreme Court, is yet another in a series of cases arising out of confiscations of property by the Castro regime in Cuba.[4] Owners of Cuban cigar companies who fled to the United States brought an action against American importers to recover the proceeds of cigar sales to the importers. The companies had been nationalized, and agents of the Cuban government intervened, claiming the amounts due from the importers. The importers continued to do business with the nationalized companies and shipments were received in the United States before and after nationalization.

The Court held that the act of state doctrine applied to proceeds from shipments that left Cuba after expropriation, but the owners were entitled to accounts receivable due from shipments made be-

---

4. See, *e. g.,* Banco Nacional de Cuba v. Sabbatino, 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed. 2d 804 (1964); First National City Bank v. Banco Nacional de Cuba, 406 U.S. 759, 92 S.Ct. 1808, 32 L.Ed.2d 466 (1972); Tabacalera Severiano Jorge, S.A. v. Standard Cigar Co., 392 F.2d 706 (5th Cir. 1968), cert. denied, 393 U.S. 924, 89 S.Ct. 255, 21 L.Ed. 2d 260.

fore expropriation. Relying on *Republic of Iraq, supra,* the Court said [485 F.2d at 1364]:

"Application of the principles of that case here satisfies us that since the owners' accounts receivable had their situs in the United States rather than in Cuba at the time of intervention and since the Cuban government's purported seizure of them without compensation is contrary to our own domestic policy, the act of state doctrine does not apply, the confiscation was ineffective, and the interventors' [agents of the new Cuban government] claim must be rejected. The owners rather than the interventors therefore remain entitled to collect these accounts."

We have already held that the debt was located in New York at the time the Bangladesh government attempted to seize it. This determination is dispositive, because [*Menendez, supra,* at 1361, fn. 4]:

"The act of state doctrine has never been applied to attempted seizures by a foreign state of property located outside of its territory."

Since the Court is not bound by the act of state doctrine to give effect to the confiscatory decrees of the Bangladesh government, we may apply our own public policy, which does not recognize the validity of governmental takings without compensation. The result, of course, is that the Pakistani banks are entitled to the funds held by Cosmic.

To avoid this result, the Bangladesh plaintiffs advance three principal arguments. First, they assert that the branch offices of the Pakistani banks located in East Pakistan were not branch offices but independent entities or bodies corporate. These independent entities, the argument is, made loans to Amin and Nishat before they were nationalized, and the Bangladesh banks, as their successors with respect to the activities of the banks conducted there, are entitled to payment. The Bangladesh banks, Janata Bank and Sonali Bank, claim all

"rights and interests in, or arising out of, such property as were immediately before the commencement of this Order in the ownership, possession, power or control of the existing bank . . . within the territory of Bangladesh *or . . . outside Bangladesh.*" The Bangladesh Banks (Nationalisation) Order, 1972, ¶ 7(1). (Emphasis added).

It is not clear that this Order would be interpreted by a Bangladesh court to reach debts of Cosmic to the Pakistani banks. Asarul Hossain, Esq., a prominent Bangladesh lawyer called by the Bangladesh plaintiffs as an expert on the law of Pakistan and Bangladesh, testified that property within the reach of the above-quoted paragraph had to be "present" in Bangladesh at the time the banks were nationalized (Tr. p. 71). Mr. Hossain was not asked whether a Bangladesh court would consider a debt payable in the United States to be "present" in Bangladesh.

National Bank of Pakistan was established under the laws of Pakistan, by its own Ordinance, in 1949. Chapter II, ¶ 3, National Bank of Pakistan Ordinance, 1949, reads in relevant part:

"(1) As soon as may be after commencement of this Ordinance, there shall be constituted . . . *a bank* to be called the National Bank of Pakistan.

(2) *The Bank* shall be a body corporate having perpetual succession and a common seal, and shall by the said name sue and be sued." (Emphasis added)

The Ordinance provides for one Central Board, having the power to "make byelaws not inconsistent with this Ordinance" [¶ 32(1)]. Among the by-laws the Central Board is empowered to make are by-laws providing for [¶ 32(2) (xxvii)]:

"the establishment and discontinuance of branches and agencies in Pakistan or elsewhere and the nature and extent of the business any branch or agency may transact."

The authority of the East Pakistan branches was cancelled by National Bank the day after Bangladesh troops gained control of the territory. National Bank of Pakistan continues in business and has a branch office in New York. Certainly no branch can be autonomous if its very existence depends on an Order of the Central Board in Pakistan. The loans to Nishat were approved by the Central Board; the profits and losses of all branches were pooled to determine the profit or loss of the Bank itself; the Bank issues a consolidated Annual Report and dividends were declared by the Central Board. Mr. Hossain, who was legal advisor to National Bank of Pakistan by appointment of its Central Board, testified:

> "Q You do draw a distinction between the National Bank of Pakistan and the National Bank of Pakistan Dacca?
>
> A No . . . up to 16 of December, '71 . . . there was only one bank called the National Bank of Pakistan . . . the statute says that is body corporate . . . ." (Tr. pp. 67–68).

■ The Court finds that the East Pakistan offices of National Bank of Pakistan were in fact branch offices, and therefore the debt owed to the Bank by Nishat was an account receivable of the Bank itself, not of the branch office in Dacca.

United Bank Limited was incorporated under the general corporation law of Pakistan, the Companies Act of 1913, with its principal place of business and registered office in Karachi, Pakistan. On or about December 16, 1971, United Bank cancelled all authority of its branch offices in East Pakistan.

A. M. Haidermota, Esq., called by United Bank as an expert witness on the law of Pakistan, testified that under the Companies Act and controlling decisions construing the English statute upon which the Companies Act was based, "branches are merely agencies of the corporate body." (Tr. p. 83). This un-contradicted interpretation of the law of Pakistan is accepted by the Court.

The testimony of Mr. Amir A. Siddique, Vice President of United Bank, on behalf of United Bank, and of Mr. Kazi Abdul Mazid, formerly employed by United Bank as manager of a number of its East Pakistan branches, on behalf of Janata Bank, his present employer, shows there is no basis whatever in fact or law for the claim that United Bank's branches were separate entities.

The original loan to Amin was approved by United Bank's head office in Karachi (Tr. p. 11). Further advances were approved by the head office (Tr. p. 120). Reports of operations were submitted by each branch to the head office (Tr. p. 122), which prepared a consolidated balance sheet for the Bank and all its branches and declared dividends (Tr. p. 135). United Bank continues to honor obligations incurred by its East Pakistan branches to parties outside Bangladesh (Tr. p. 135).

Mr. Mazid's assertions that "the branches had independent working, independent books, independent" and that "the branches . . . had the authority to transact and approve an action and it was not necessary to obtain sanction from Head Office" (Tr. pp. 21–22) are totally unworthy of belief, particularly since Mr. Mazid's power was so limited that he had to obtain approval from the head office to reimburse himself for travel expenses in the amount of 50 rupees ($12.00) (Tr. pp. 37–38).

The Court finds that the East Pakistan offices of United Bank were branch offices of that Bank having no separate existence of their own and no right independent of United Bank to claim the funds held by Cosmic.

■ The Bangladesh plaintiffs' second contention is that because Cosmic would be subject to the jurisdiction of the courts of Bangladesh if a suit had been brought there to recover Cosmic's debt, the situs of the debt is Bangladesh, the act of state doctrine applies, and the debt belongs to them.

For this proposition, the Bangladesh plaintiffs rely on the following *dicta* in *Menendez, supra:*

"For purposes of the act of state doctrine, a debt is not 'located' within a foreign state unless that state has the power to enforce or collect it." 485 F. 2d at 1364

"In the absence of any showing that the importers or their agents were present in Cuba or subject to the jurisdiction of Cuban courts at the time of the intervention . . . no legal effect should be accorded to Cuba's purported confiscation." 485 F.2d at 1365.

The facts in *Menendez* do not differ in any significant way from the facts of this case; the principles are the same whether Cuba or Bangladesh is the confiscating country. In *Menendez,* the Court specifically held that the situs of the debt is where the debtor may be found (485 F.2d at 1365), and the Court did not indicate that its decision would have been different or in what way it would have been different if the importers had been subject to the jurisdiction of the Cuban courts.

We do not believe that by these isolated statements, the Court intended to overturn a rule firmly embedded in American jurisprudence at least since Harris v. Balk, 198 U.S. 215, 25 S.Ct. 625, 49 L.Ed. 1023 (1904). We reject the suggestion that, based on speculation about the result in a case that might have been brought in Bangladesh but was not, this Court should take a position at odds with long-established American precedent.

█ Furthermore, it is by no means clear that Cosmic would be subject to the jurisdiction of the courts of Bangladesh. As might be expected in any case of this nature, the legal experts are divided according to their political loyalties. Litigants in the courts of the United States should not be subjected to such vagaries. The act of state doctrine is the equivalent in international law of

the "political question doctrine", and was devised to prevent intrusion by our courts into the political affairs of foreign countries. When property is located in the United States, the only law that can be applied with any certainty, and the law the Supreme Court has directed must be applied, is our own. To hold otherwise would, as held in Menendez v. Faber, Coe & Gregg, Inc., 345 F. Supp. 527, 545 (1972):

"extend the act of state doctrine to unprecedented lengths. It would render nugatory the sound principle that our courts will not give extra-territorial effect to a confiscatory decree of a foreign state and thereby emasculate the public policy of the forum against confiscation."

█ The third argument is that (Post-Trial Memorandum on behalf of Bangladesh Plaintiffs, pp. 48–49):

"The goods in question . . . were all manufactured in the territory of Bangladesh. These goods were the product of the sweat and toil of Bengali workers.

\* \* \* \* \* \*

From time immemorial, the population of that region has been subject to various catastrophes, ranging from flood to tidal waves. In addition, this population has been exploited economically by those who have previously ruled the area from afar. These exploited peoples have now obtained their own independence to end this exploitation.

Bangladesh continues to be subject to various catastrophes. In fact the lives of the Bengalis continue from catastrophe to daily calamity. . . . [T]his Court should not deprive these oppressed peoples of the fruits of their land and the products of their toil."

In no sense do we depreciate the difficulties of emerging nations in these parlous times. However, we must be guided by neutral principles of law applied to these facts. This Court cannot

act as an almoner with the funds of others, nor overlook "the policy of the United States . . . that there is no such thing as a 'good' confiscation by legislative or executive decree." *Republic of Iraq, supra,* 353 F.2d at 52.

Under the act of state doctrine as it has been applied by the Supreme Court since *Hernandez, supra,* was decided in 1897, National Bank of Pakistan is entitled to recover the sum of $97,043.50, plus interest at six percent (6%), computed from February 27, 1973, the date of filing of the earlier of the two actions. United Bank Limited is entitled to recover the sum of $433,365.96, plus interest at six percent (6%), computed from December 14, 1972, the date of filing of the earlier of the two suits.

Settle final judgment on notice.