# Effect Within the United States of Iranian Decrees Confiscating the Shah's Assets

Courts of the United States may give effect to Iranian decrees confiscating the property of the late Shah and his family, and will do so if the Executive stipulates, as an integral part of an international agreement with Iran, that such decrees will be given extraterritorial effect within the United States.

November 17, 1980

## MEMORANDUM OPINION FOR THE LEGAL ADVISER, DEPARTMENT OF STATE

We have explored the question whether the United States can give effect within the United States to Iranian decrees cónfiscating the property of the late Shah and his close relatives. This issue arises from the demand of the Iranian government that we recognize the nationalization as a condition to resuming normal relations and securing return of the hostages. Our general conclusion is that the Executive can, as an integral part of an agreement with Iran, stipulate that the decrees will have extraterritorial effect and that the courts will recognize such an agreement. On the other hand, if the government simply announces that the decrees should be given effect here or makes such a representation in court, the courts would not treat the position as conclusive.

Generally, under the act of state doctrine, the courts of one nation will not sit in judgment on the act of another nation within the latter's territory. *Banco Nacional de Cuba* v. *Sabbatino,* 376 U.S. 398, 416 (1964). However, the validity of an act of a foreign state with respect to matters *outside* its territory may be examined by our courts under applicable laws and will only be given effect if in accord with our public policy. Restatement (Second) of Foreign Relations Law of the United States § 43 (1965). Thus, it is not unusual to find American court decisions not giving extraterritorial effect to foreign confiscation decrees. In a situation similar to the case at hand, the Second Circuit refused to give effect to a decree by which Iraq purported to confiscate the estate of King Faisal II, who was killed in a revolution in 1958. *Republic of Iraq* v. *First National City Bank,* 353 F.2d 47 (2d Cir. 1965), *cert. denied,* 382 U.S. 1027 (1966). Iraq sued to recover the King's estate in the United States. The court said that confiscation of the assets of an individual is contrary to our public policy and sense of justice, citing

the Due Process Clause and the prohibition against bills of attainder. *Id.* at 51–52.

The question arises as to whether the Executive can do anything to alter such a determination. (In the *Iraq* case the Executive made no attempt to indicate a federal policy on recognition of the decrees and left the policy determination to the courts.) Although application of the act of state doctrine "must be treated exclusively as an aspect of federal law," *Sabbatino,* 376 U.S. at 423–27, nevertheless, the Supreme Court has concluded that the courts are not bound to follow the Executive in cases where it makes suggestions as to whether the doctrine should apply. *First National City Bank* v. *Banco Nacional de Cuba,* 406 U.S. 759 (1972). The filing of a suggestion of interest would not therefore assure that the Executive's views would be followed.

The Iranians have also demanded that the United States issue a proclamation dealing with the Shah's property. In view of *First National City Bank,* it is not clear that the courts would consider such a proclamation conclusive. Thus, it would probably be treated like a formalized suggestion of interest.[1]

An executive agreement would, however, stand on a different footing. The principle has been established that federal policy must be recognized as binding when the Executive enters an international agreement which recognizes the validity of foreign expropriation decrees. The Soviet government took power in 1918 and nationalized the assets of many enterprises wherever situated. When the United States recognized the Soviet government in 1933, it settled claims with the Soviet Union by taking an assignment of Soviet assets in the United States. The assignment included the nationalized property. The United States government sued in local courts for possession of the assigned assets. The New York courts ruled that recognition of the expropriations was contrary to the controlling public policy, and that the United States could take by assignment no more than the Soviet government had. The Supreme Court reversed, holding that the assignment was a valid exercise of the President's foreign relations power and that the international agreement (giving extraterritorial effect to the confiscations) was binding on the courts. *United States* v. *Pink,* 315 U.S. 203 (1942); *United States* v. *Belmont,* 301 U.S. 324 (1937). In the present case the United States would presumably not be taking an assignment of the Shah's

---

[1] The language of the International Emergency Economic Powers Act (IEEPA), 50 U.S.C. § 1702 (Supp. I 1977), states that the President may "prevent . . . any . . . withholding of . . . any property in which any foreign country . . . has any interest." This raises the possibility that IEEPA may be used to bolster the legal position of the Iranian authorities vis-a-vis the Shah's family. We know of no precedent, however, for the use of either IEEPA or its predecessor, the Trading with the Enemy Act, for such a purpose and express no opinion on the question at this time. Care should be taken to make clear that the United States is not by its own action nationalizing the Shah's assests but merely recognizing Iran's actions. The treatment a foreign government gives its own nationals does not in itself raise Fifth Amendment questions. *United States* v. *Belmont,* 301 U.S. 324, 332 (1937).

assets,[2] but if the recognition of the expropriation were an integral part of a claims agreement, we believe the holdings of *Pink* and *Belmont* would apply.

We also believe that *Pink* and *Belmont* are still controlling law. Although these cases have been distinguished by courts refusing to give extraterritorial effect to confiscations, in the absence of an international agreement, they have not been questioned on their own facts. The *Iraq* case, 353 F.2d at 52, affirmed that policy could be set by international agreement:

> Such action of the Chief Executive, taken under his power to conduct the foreign relations of the United States, was considered to make the Soviet confiscation decrees consistent with the law and policy of the United States from that time forward, and, as we now know from *Sabbatino,* federal law controls.

*Sabbatino* itself did not deal with the extraterritorial issue, but the holding of the case recognized, 376 U.S., at 428, that a treaty or "other unambiguous agreement" could establish controlling legal principles in an act of state case.[3] Although a majority of the court in *First National City Bank, supra,* stressed the fact that the Executive's representations to the courts were not to be conclusive, a fair reading of the case does not suggest that the Court intended to limit the President's power to conclude international agreements or to change their effect.

JOHN M. HARMON
*Assistant Attorney General*
*Office of Legal Counsel*

---

[2] Conceivably this might be done as a set-off for certain claims although we do not know of its having been proposed. It should be noted that in *Belmont* and *Pink* the net effect of recognizing the confiscations was to make additional assets available to U.S. claimants, some of whom had suffered from other Soviet expropriations. Even if the United States does not take an assignment of these assets, it might be argued that any potential claims pool with Iran has been increased by our crediting the Iranian decree in the context of a total settlement.

[3] *See also* White, J., dissenting: "No one seriously argued that the act of state doctrine precludes reliance on a binational compact dealing with the effect to be afforded or denied a foreign act of state." *Id.* at 444 n. 2.