**NEW YORK LAND COMPANY, et al., Petitioners,**

**v.**

**REPUBLIC OF PHILIPPINES, Respondent.**

No. 86 Civ. 2294 (PNL).

United States District Court, S.D. New York.

May 2, 1986.

Amended May 5, 1986.

Phillips, Nizer, Benjamin, Krim & Ballon, New York City (Michael J. Silverberg, of counsel), for petitioners Joseph and Ralph Bernstein and New York Land Co.

Bernstein, Carter & Deyo, New York City (Philip Carter, of counsel), for petitioners Canadian Land Co. of America, N.V., Herald Center, Ltd. and Nyland (C F 8) Ltd.

Rosenman, Colin, Freund, Lewis & Cohen, New York City (Gerald Walpin and Lawrence G. Golde, of counsel), for defendant Ancor Holdings, N.V.

Golenbock, Eiseman, Assor, Bell & Perlmutter, New York City (Jeffrey T. Golenbock and David J. Eiseman, of counsel), for Glockhurst Corp., N.V.

James Drew & Associates, Washington, D.C. (Severina Rivera, of counsel), and Center for Constitutional Rights, New York City (Morton Stavis, Peter Weiss, Franklin Siegal and Juan Saavedra-Castro, of counsel), for respondent.

## OPINION AND ORDER

LEVAL, District Judge.

This is a motion by several defendants to vacate a temporary restraining order ("TRO") originally imposed in New York State Court and continued with modifications by this court after some of the defendants removed the action. The moving defendants contend that the temporary restraining order must be vacated because, absent consent, the court lacks the power under the Federal Rules of Civil Procedure to continue such an order beyond the twenty days permitted by Rule 65(b). *Pan American World Airways v. Flight Eng'rs' Int'l Ass'n*, 306 F.2d 840 (2d Cir. 1962). Plaintiff contends the restraints should be continued (in present or in fur-

ther modified form) either as a temporary restraining order pending submission of further proofs on the preliminary injunction hearing, or as a preliminary injunction supported by plaintiff's submissions.

Plaintiff is the Republic of the Philippines. The principal defendants are the former President of the Philippines, Ferdinand Marcos and his wife Imelda Marcos. They have been served with process but have not appeared. Plaintiff has submitted a proposed default judgment against them. The complaint alleges that during President Marcos's term in office, he and Mrs. Marcos wrongfully took property belonging to the Republic of the Philippines. It is alleged that part of the moneys so taken were used by President and Mrs. Marcos to invest in valuable New York real property, including 730 Fifth Avenue (the Crown Building); Herald Center (formerly Korvettes) at 34th Street and 6th Avenue; 40 Wall Street; 200 Madison Avenue, and a large mansion in Center Moriches, Long Island referred to as the Lindenmere Estate (the "Properties").

The moving defendants are several real estate holding companies, and their alleged principals and managers, which are the record holders of the Properties, allegedly as nominees for President and Mrs. Marcos. (The defendant-movants are hereinafter referred to as the "Record Holders.") The TRO which the Record Holders seek to have vacated essentially bars the defendants from transfering or encumbering the Properties.

When the action was brought in New York State Court, a temporary restraining order was entered barring the defendants from taking any of a variety of actions with respect to the Properties. After removal, this court continued the order pending the preliminary injunction hearing but substantially eased its terms to permit profitable commercial use of the property to the maximum extent while protecting plaintiff's claimed equity interest.

Shortly after the removal, expedited discovery was ordered and a schedule was set for the submission of proofs on the preliminary injunction hearing. The schedule was delayed partly at the instance of defendants, who, for example, requested adjournment of the depositions of Joseph and Ralph Bernstein so that they could first testify before a Committee of Congress. In seeking that delay the defendants consented to adjournment of the preliminary injunction schedule.

Approaching the expiration date of the consent given, defendants suddenly advised plaintiff that they would give no further consent, and refused to furnish any further depositions. Defendants then filed this motion for immediate dissolution of the TRO. In response to the motion to dissolve the restraints plaintiff has hastily bundled together a mass of documents and depositions acquired thus far in discovery and has submitted these papers on April 28, 1986 in support of a preliminary injunction.

Defendants have submitted no proofs in opposition. They rely primarily on the act-of-state doctrine, the immunity of President Marcos under Philippine law, the Foreign Sovereign Immunity Act of 1976, 28 U.S.C. §§ 1602 *et seq.*, the principle of *forum non conveniens* and the contention that plaintiff's proofs are conjectural and insufficient.

In order to qualify for preliminary injunctive relief in this Circuit, plaintiff must show "(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting the preliminary relief." *Jackson Dairy v. Hood,* 596 F.2d 70, 72 (2d Cir.1979). Considering all the proofs and circumstances, I find that the Republic of the Philippines has sufficiently supported its position to satisfy the requirements of law. It has demonstrated entitlement to a preliminary injunction.

## I. *Background*

Joseph Bernstein testified that in mid-1981 he began buying and subsequently

managing New York commercial properties for undisclosed owners fronted by a Mrs. Gliceria Tantoco, a Philippine national and close friend and business associate of the Marcoses. During the next two years, he arranged for the purchase by the Tantoco interests of the Crown Building at 730 Fifth Avenue (called the Genesco Building at the time of purchase), 40 Wall Street, and the Herald Center Building (formerly E.J. Korvettes) at 34 Street and 6th Avenue. Subsequently he competed for but did not win the opportunity to act as agent for the Tantoco interests in their purchase of 200 Madison Avenue.

Bernstein set up or caused to be set up two tiers of offshore corporate vehicles for the acquisition and ownership of the three commercial properties as follows:

The Crown Building was purchased in September 1981 in the name of Lastura Corporation, N.V., a Netherland Antilles corporation, now called the Canadian Land Company of America, N.V. Joseph Bernstein served as director from 1982–84. Its shares were held by two Panamanian companies issuing bearer shares: Trade and Commodities, S.A. and Yewell Compagnia Immobiliera.

Herald Center was purchased in February 1981 in the name of a British Virgin Islands corporation named Voloby, Ltd. (now called Herald Center, Ltd.). Bernstein served as its sole director. Its shares were held by three Panamanian corporations issuing bearer shares: Bedner Development Corp., Compral Investment, S.A. and Dicet Finance Investment Corp.

40 Wall Street was purchased in December 1982 in the name of an Antilles corporation now called Nyland (CF 8), Ltd. (formerly Ainesville, N.V.). Bernstein served as one of its 3 directors after Tantoco directed him to establish the corporation in 1982. It is owned by three Panamanian corporations issuing bearer shares: Beneficio Investment Incorporated, Bueno Total Investment Incorporated and Excelencia Investment Incorporated.

Although Bernstein did not succeed in representing the Tantoco group in their purchase of 200 Madison Avenue he testified that he was familiar with the situation, and had competed for the right to act as manager. In the fall of 1983, 200 Madison Avenue was acquired in the name of Glockhurst Corporation, N.V., a Netherland Antilles corporation. Bernstein, who established the three Panamanian corporations named above (Bender, Compral and Dicet) to hold the shares of Voloby and served as their attorney, testified that he believed the shares of Glockhurst had been transfered by Mrs. Tantoco to those corporations.

The acquisition of the Lindenmere Estate in Long Island, New York was not handled by Bernstein and does not appear to involve Mrs. Tantoco. It was purchased by Philippine interests in February 1981 in the name of Luna 7 Development Corp. Later it was transferred to its present owner, Ancor Holdings, N.V., a Netherlands Antilles corporation. Augusto Camacho, Lindenmere's architect, was President and a 10% stock owner of Luna. Ancor has one corporate and two individual directors, one of whom is Antonio O Floirendo, a friend and business associate of the Marcoses.

## II. *Evidence on the Merits*

The two general areas to which the plaintiff's proofs must be addressed are that President and/or Mrs. Marcos are beneficial owners of the Properties and that their acquisition of the Properties was with funds converted from the Republic of the Philippines.

### A. *Evidence of Ownership*

██ The evidence of Marcos ownership of the Properties arises from actions and statements of the Marcoses supporting an inference of ownership, and from a great number of documents, many found in the Malacanang Palace immediately after their departure on February 25, 1986. Although the evidence produced thus far certainly falls short of conclusively demonstrating Marcos' ownership of the Properties, it is more than sufficient to raise fair questions

for litigation, as required by the *Jackson Dairy* standard.

### 1. *Behavior Suggesting Ownership*

The evidence shows numerous instances in which President and Mrs. Marcos acted in a manner suggesting an ownership interest in the Properties:

Joseph Bernstein testified that in mid-1981 he began to discuss with Mrs. Tantoco the possible acquisition of the Crown Building by undisclosed principals. Shortly after the acquisition was concluded, Bernstein met with Mrs. Tantoco and Mrs. Marcos who then took an active role in discussing plans for the building.

Peter W. Williams, an attorney with the law firm of Rogers and Wells, testified by affidavit (made at the request of the U.S. House Subcommittee on Asian and Pacific Affairs) describing his firm's involvement with several of the record holder defendants. Williams testified that his firm was retained in September 1981 by Banque Paribas (Suisse) to act for undisclosed clients of Paribas engaged in the purchase of the Crown Building (730 Fifth Avenue). As the acquisition vehicle, he formed the defendant Lastura Corp., N.V., a Netherlands Antilles company (now named Canadian Land Company of America, N.V.). The purchase of the building was consummated on September 30, 1981. Two weeks later, at the request of Mr. Cattaui, his contact at Paribas, Mr. Williams travelled with him to Honolulu and there met with Ferdinand Marcos. Again two weeks later, he accompanied Mr. Cattaui to a meeting in New York with Imelda Marcos. At the meeting Mrs. Marcos discussed with Mr. Cattaui plans for the renovation of the building. Mr. Williams testified that he understood he "was asked to attend the meeting to respond to any legal questions in connection with the purchase of the Crown Building...." In mid-1982 the legal representation of Lastura was transferred from Rogers & Wells to the law firm of Bernstein, Carter and Deyo, Joseph Bernstein's firm.

An official of the Philippine National Bank who had ties with President and Mrs. Marcos and was knowledgeable about New York business, testified by affidavit that he was "contacted by Mr. and Mrs. Marcos for my views and opinions on real properties in New York ... I specifically remember a telephone conversation with Mr. Marcos in the fall of 1981 ... regarding ... the Crown building.... I gathered the impression that Marcos was interested in the Crown Building." In late 1981 and early 1982 Mrs. Marcos questioned him about the 40 Wall Street property. Bernstein testified further that in March 1982 President Marcos asked him for advice about structuring a $34 million loan from Paribas Suisse to the Lastura Corporation (the record owner of the Crown Building). (Bernstein Dep. at 208–09; Bernstein House Testimony, at 35–37.)

Bernstein also testified that in April 1982 Roland Gapud, who was a business advisor of President Marcos, dictated to him a declaration of trust by which Bernstein would undertake to serve as trustee for the benefit of Ferdinand Marcos for all matters concerning the Lastura Corp., N.V. The dictated draft of the trust deed provided furthermore that Bernstein as trustee, with respect to the shares of Lastura, was to act in accord with the instructions of President Marcos. (Salonga dep. at 33–35 and Bernstein dep. at 42–44.)

Bernstein testified that throughout the course of his activities in acquiring and managing subject Properties he has understood and believed that the Marcoses were the owners of Crown, 40 Wall Street, Herald Center, and 200 Madison Avenue.

Among the factors on which he based his belief were a number of instances in which Imelda Marcos acted in a manner suggesting ownership, including the following:

(1) Mrs. Marcos, and at times her staff, generally attended meetings concerning the financing and commercial status of the Manhattan properties; meetings were often held in her New York hotel rooms, in Manila or at the Philippine Consulate in Manhattan; "she [was] making the decisions" at these meetings; (2) Mrs. Marcos

gave the orders at the meetings and told Mrs. Tantoco "what should be done" with the Crown building and other properties; (3) shortly after the signing of the contract for the purchase of 40 Wall, Mrs. Marcos expressed a desire to Bernstein and Mrs. Tantoco to go see the building. They went together to look at it, whereupon, Bernstein testified, "Mrs. Marcos said it was a nice building. To me it appeared she seemed to be proud of it"; (4) during a 1984 meeting about the financing of the commercial properties, held at the Philippine Consulate and attended by Mrs. Marcos, members of her staff, Bernstein, Tantoco, Gapud, and Barry Knox, a financial adviser to the owners of the Properties, Mrs. Tantoco asked Mrs. Marcos if $10,000,000 was available for investment in developing the 40 Wall Street property. Mrs. Marcos replied to the effect that there was no money, but, responding to a prior suggestion that 40 Wall be sold, Mrs. Marcos had said that "the properties wouldn't be sold." At a later meeting again attended by Mrs. Marcos, Bernstein, Tantoco and Gapud to discuss further the need for an infusion of $10 million capital for development of 40 Wall Street, Mrs. Marcos asked Gapud, "Do we have $10,000,000?" When he responded in the affirmative, Mrs. Marcos directed Gapud to give Mrs. Tantoco $10,000,000. (Bernstein dep. at 23–38.)

## 2. Documents Suggesting Ownership

A variety of documents, including bank records, reports, financial statements, receipts and personal written communications, which the Republic of the Philippines advises were found at the Marcoses' residence at Malacanang Palace immediately after their hasty departure in February, support the inference of a Marcos ownership interest in the five Properties. Among such documents are the following:

(a) A memorandum from Gliceria Tantoco addressed "To the Beneficial Owners of Canadian, Voloby, Nyland and Glockhurst" regarding "Repayment of Current Personal Debts Through Financing From the Future Earnings of Real Estate Properties." This memorandum discusses the possibility of raising $16.8 million (to be used for repayment of personal debts) by taking a new third mortgage on 40 Wall Street. The memo observes that a consequence of such a borrowing "would be to eradicate the cash flow to the owner ... for the period 1984 to 1991." The memo goes on to observe that the "acquisition of [200 Madison by Glockhurst Corp.] ... is planned to be achieved purely through borrowing (by Canadian [the record holder of Crown] and Glockhurst)...."

(b) "New York Real Estate Accounts Summary Report" memorandum describing the equity investments in 40 Wall Street, the Crown Building and Herald Center. This is a 9 page detailed analysis of the financial condition of Voloby (record holder of Herald Center), Nyland (record holder of 40 Wall), and of Canadian Land Co. (record holder of Crown).

(c) A report detailing the use of a $37.5 million dollar loan from Citibank to Nyland Corporation (40 Wall Street), indicating Nyland's use of the funds to make loans to Canadian Land Company, Voloby and Glockhurst.

(d) A handwritten accounting was found in Gimenez's Malacanang Palace files showing the following entries:

| | |
|---|---|
| $5.5 million | - Tantoco |
| $9.5 million | - Voloby |
| $6 million | - Floirendo |
| $4.3 million | - Blackhurst (sic) 11/4/83 |
| $25.3 million | - Total. |

(Senator Salonga in his deposition expressed the belief that this was an accounting by Vilma Bautista to Fe Gimenez. Regardless whether Senator Salonga is correct and regardless whether he has a proper evidentiary basis for this opinion, the simple fact that such an accounting was found in Fe Gimenez's files at the Marcos residence gives support to plaintiff's contention.)

(e) A receipt for 3 Voloby stock certificates (former record owner of Herald Center) handwritten on official Malacanang stationary, was found in the Palace. The

receipt states that the shares were "to be given to Rico Tantoco," (Gliceria's son).

(f) A single page handwritten sheet detailing various financial figures relating to Voloby Ltd. and the operation of the "Korvette Building" [as Herald Center was formerly known].

(g) A handwritten memo on printed memo form of New York Land Company (the Bernsteins' company) addressed to Mrs. Marcos' personal secretary Fe Gimenez reporting on "leases signed to date" for the Herald Center building.

\*   \*   \*   \*   \*   \*

Glockhurst [recordholder of 200 Madison] claims there is no evidence that it is owned by the Marcoses. The claim is without merit. While it is true there is little evidence of actions of President or Mrs. Marcos respecting 200 Madison, there is considerable documentary evidence of common ownership of the four Manhattan commercial Properties. A number of these documents are discussed in the preceding paragraph. For example: (a) Mrs. Tantoco's memorandum addressed "To the Beneficial Owners of Canadian, Voloby, Nyland and Glockhurst" carries a strong inference of common ownership and states that 200 Madison is to be acquired by Canadian's borrowing on the Crown Building; (b) the one page memorandum on "Uses of the $37.5 loan from Citibank for Nyland" shows that a borrowing by the record holder of 40 Wall was to be used in part as payments for the record holders of Crown, Herald Center and 200 Madison.

Lengthy detailed periodic financial analyses of the four Properties prepared for their owners by Barry Knox and disclosed in discovery by the attorneys for Crown, 40 Wall and Herald Center, treat the four Properties, including 200 Madison, as a joint and interdependent economic enterprise.

Joseph Bernstein has testified that he believed the shares of Glockhurst are held by the same three Panamanian corporations as hold the shares of Voloby [Herald Center]. Bernstein is attorney for those three Panamanian companies. He testified

further to his belief that Mrs. Marcos had an interest in all four Properties and that, among the four, "there was never a distinction between the one and the other when I was involved." (Bernstein dep. pp. 37, 158–60.)

*Lindenmere*

Although the evidence with respect to Lindenmere is less compelling than with respect to the Manhattan commercial properties, it is sufficient to meet the *Jackson Dairy* standard.

The following documents were found in Fe Gimenez's files at the Palace:

(a) An accounting of checks issued by Fe Gimenez in May 1982, including a $119,-149.89 item on May 1, 1982 for "Lindenmere" (Salonga Ex. 7).

(b) Handwritten list of Lindenmere expenses, including entries for monthly telephone, electric and housecleaning expenses as well as monthly real estate taxes. The Lindenmere housekeeper, Emily Austin, is listed by name along with payments to her. (Salonga Ex. 8.)

(c) The word "Lindenmere" appears on a handwritten list found in Fe Gimenez's files at the Palace, together with: "66th" (66th Street Philippine Townhouse); "Princeton" (Marcoses' owned property near Princeton University); "Cherry Hill" (location of property allegedly owned by Marcoses) and "Vilma" (Mrs. Marcos's secretary Vilma Bautista in the United States). (Salonga Ex. 8).

(d) Augusto Camacho, the Lindenmere architect and originally a shareholder in the property, testified that Mrs. Marcos used Lindenmere on several occasions, bringing twenty or thirty guests with her. Camacho further testified and submitted documents showing that he submitted statements of account that covered both his work on the Lindenmere property and the Philippine government townhouse on 66th Street to Mrs. Marcos's New York secretary Vilma Bautista. He stated that to the best of his knowledge, he was "receiving funding from the same source" for his work on the

two properties. In addition, Camacho complained to Mrs. Bautista about deliquency in paying his architectural fees for Lindenmere, after which he received $150,000 from the Bernstein law firm. He also complained to Bautista that when the Lindenmere property was transferred from Luna 7 Corp., of which he was a shareholder, to Ancor Holdings, he had received no consideration. After he had brought suit on these claims in January 1984, he was offered $850,000 in settlement by Fe Gimenez, Mrs. Marcos's personal secretary.

(e) Antonio Floirendo, one of the two managing directors of Ancor Holdings, N.V. (record holder of Lindenmere) and alleged by Ancor to be the beneficial owner of Lindenmere, received a $500,000 loan from the Philippine National Bank in February 1979 and in July 1982 was asked by Mrs. Tantoco to give Joseph Bernstein $600,000 for Herald Center.

## B. *Evidence of Illegality*

■ Documentary and testimonial evidence submitted by the plaintiff gives support to the contention by the Republic of the Philippines that Ferdinand and Imelda Marcos misappropriated funds of the Republic, and that they have used such misappropriated funds in connection with the New York Properties. Among plaintiff's evidence is the following:

In a memorandum found at Malacanang Palace on letterhead of the "Philippine National Bank—Official Depository of the Philippines," the President of the Bank requests the approval of President Marcos concerning the "Philippine Intelligence Fund" as follows:

May I request your approval to charge *temporarily* against Accounts Receivable (Office of the President) the unliquidated advances from our New York Branch totalling US$9,805,371.98.

Disposition of the receivable will subsequently be made from the Philippine Intelligence Fund *to be provided out of PNB* [Phillipine National Bank] *profits when the income or profit position of PNB can absorb it.* (Emphasis added.)

The request appears to be approved by President Marcos' signature. Attached to the memorandum is a list specifying 114 items from the period 1976–1982 totalling $9,805,371.98. An apparently related document captioned "Float Items in the PNB New York," includes in Schedule A all the transfers reported in the Philippine Intelligence Fund document described above, as well as in Schedule B, a listing of 67 items totalling an additional $8,274,326.94 described as "Total Lodged to AR—Office of the President." Also attached is a Schedule B–1 with 23 items amounting to $5,503,368.15 described as "Fund Transfers and Various Disbursements per Request/Instruction of Ms. Fe Roa Gimenez Lodged to AR—Office of the President," Schedule B–2 including 8 items amounting to $1,350,242.13, Schedule B–3 including 37 items amounting to $1,420,716.63, and a Schedule C with 7 entries totalling $1,414,260.81.

A fair inference of these documents is that the listed payments (discussed below amounting to many millions of dollars) were made out of funds of the official depository of the Philippine Republic, through the so-called Special Intelligence Fund, "temporarily" charged to "Accounts Receivable—Office of the President" to be eventually covered by the profits of the Philippine National Bank. The list indicates that the great bulk of the payments were made to, or at the direction of Mrs. Marcos's personal secretaries. The list furthermore indicates that many payments were for the personal benefit of the Marcoses, including payments related to the Properties at issue.

Included in the list of "advances" are:

a) $300,000 to the account of Voloby, Ltd. at Irving Trust, dated June 1, 1982. [Voloby is the record owner of Herald Center.]

b) Numerous transfers in 1977 and 1978 to "Princeton" and the "Princeton Univ. Store."

c) Transfers exceeding $3 million to accounts of Fe Gimenez [personal secretary to Mrs. Marcos].

d) Countless disbursements exceeding $6 million listed merely as "per instruction Fe Gimenez."

e) Payments made to Mrs. Vilma Bautista [Mrs. Marcos secretary in New York] exceeding $450,000.

f) A transfer of $500,000 to Antonio Floirendo on February 9, 1979. [Mr. Floirendo is a managing director of Ancor Holdings, N.V., the record owner of the Lindemere property.]

g) Transfer of more than $100,000 to Gliceria Tantoco.

h) Payments to Princeton University exceeding $5000 and an additional payment of $1500 "to Princeton Party."

A photocopy of a September 1975 check for $4767.75 drawn on the Philippine National Bank and payable to Princeton University includes the hand-written notation: "Maria Marcos '77."

Further evidence is provided by an affidavit (Exh. C) of an official of the New York Branch of the Philippine National Bank who testified that officials of the bank "would issue official checks of the Bank, deliver cash or cause the transfer of funds into the accounts of persons designated by Mrs. Gimenez." The affiant believed that these disbursements were "outside the regular banking business practice of the Branch...." While "[m]ost of the payments were made to Mrs. Gimenez," official bank checks would "occasionally" be issued in the name of Mrs. Vilma Bautista. Some of the transfers to Mrs. Gimenez were made to an organization established by bank officials, "Oscarmen Holdings, Ltd."

Documents appended to the affidavit include:

a) A hand-written confirmation on Philippine National Bank stationary of "FL's" [First Lady, Imelda Marcos] instructions to transfer one million U.S. dollars to Continental Bank in Chicago, Illinois

b) A July 1982 check payable to Antonio Floirendo [managing director of Anchor Holdings, N.V.] for $500,000 drawn against "Accounts Receivable" of the Philippine National Bank.

### C. *Defendants' Obstructive Conduct*

█ Defendants have effectively obstructed plaintiff's efforts to obtain discovery for the preliminary injunction hearing. This conduct is perhaps most evident in their repeated refusal to comply with plaintiffs' lawful discovery demands, despite court order for expedited discovery. This conduct warrants the drawing of negative inferences against them. Rule 37, Fed.R.Civ.P. A few examples of defendants' conduct follow:

At defendants' request and with plaintiff's consent, the deposition of Joseph Bernstein, originally scheduled to begin March 21, 1986 was postponed for almost one month. The deposition finally began on April 17 and was scheduled to continue the next day, but Bernstein's attorney cancelled the deposition on April 18 claiming the "public nature" of the deposition was inappropriate. On April 18 I ruled as to the issue of public testimony and ordered the continuation of the deposition. Depositions were then rescheduled for April 21 but on that day after a very brief session Bernstein's attorney, Mr. Silverberg, directed him not to testify. Mr. Silverberg advised plaintiff he would move to dissolve the TRO and would not produce Bernstein again until the motion was decided. Bernstein has not reappeared to date.

The deposition of Glockhurst Corporation (record owner of 200 Madison Avenue) was scheduled for the week of April 21. Glockhurst refused to produce a representative until the court had ruled on the motion to dissolve.

Philip Carter, Esq., a partner of the law firm of Bernstein, Carter and Deyo and attorney for defendants Canadian (Crown Building), Herald Center and Nyland Ltd (40 Wall Street) refused to produce his partner William Deyo for depositions until decision of the motion to dissolve the TRO. He also refused to respond to deposition notices served on defendants Canadian Land Company, Herald Center and Nyland Ltd.

Ancor Holdings (record holder of Lindenmere) failed to produce Antonio Floirendo, one of its managing directors, producing instead Diosado Ordonez, an Ancor agent. Floirendo is clearly a necessary witness on behalf of Ancor and the only Ancor representative capable of answering plaintiffs' inquiries. Floirendo is alleged by Ancor to be its beneficial owner. Floirendo also has a personal relationship with President Marcos and, according to Malacanang Palace documents, received substantial payments from Fe Gimenez. Ancor's claim it does not know Floirendo's whereabouts is unconvincing and insufficiently substantiated. Furthermore, at Ordonez's deposition, he was directed by Ancor's counsel not to answer plaintiff's questions seeking the whereabouts of Floirendo.

The fact that the defendants were moving to vacate the TRO, or even that the TRO was extended beyond the allowable time, is no conceivable justification for their refusal to furnish discovery to the plaintiff, especially after the court had directed the conduct of expedited discovery. Even if the TRO had been dissolved, the defendants would nonetheless have remained under obligation to produce lawfully demanded discovery. The defendants' united withholding of discovery was a blatant effort to obstruct plaintiff's efforts to obtain information to support its claims. Such conduct clearly warrants the court in drawing inferences against the defendants under Rule 37(b) and (d), Fed.R.Civ.P. This further bolsters those inferences already adequately supported by plaintiff's evidence.

■ Plaintiff's entitlement to preliminary injunctive relief is further supported by the fact that the Marcos defendants remain at present in default. If the court would be legally entitled to enter judgment against them by default, it can surely take the lesser step of ordering a preliminary restraint temporarily maintaining the status quo. Furthermore, their failure to appear has, of course, prevented the Philippine Republic from obtaining discovery of them.

## III. *Irreparable Harm and Balance of Hardships*

■ The *Jackson Dairy* test requires the applicant for a preliminary injunction to show irreparable injury and a balance of hardships tipping decidedly in his favor. Plaintiff has made strong showing of irreparable harm. If the restraints are dissolved, the Properties could pass quickly out of the plaintiff's reach through transactions involving the various tiers of offshore holding companies, which are shrouded in secrecy. Alternatively, the Properties could be sold with the proceeds delivered out of the country and beyond plaintiff's reach. Indeed, an arrangement to sell the Herald Center and 40 Wall Street properties to Joseph Bernstein was prevented by the issuance of this temporary restraining order. (Williams Aff. ¶ 12.) Denial of a preliminary injunction would effectively deprive the Republic of any hope of protecting its claim to ownership of the Properties.

As to the balance of hardships, while the harm risked by plaintiff is enormous, defendants have shown far less harm on their side. As to the three Bernstein Properties, the defendant corporations acknowledge that they are merely nominees for undisclosed owners. None of the defendants have made any compelling demonstration of hardship resulting from the restraints. The Bernstein companies, Glockhurst, and Ancor have all violated this court's orders for the provision of discovery. The Marcos defendants are in default. These defaults and refusals to provide properly demanded disclosure justify the drawing of inferences against the defendants. As to the issue of comparative harm, such inferences are scarcely necessary. The plaintiff has shown serious harm if the preliminary injunction is denied; the defendants have shown no significant harm if it is granted. Most importantly, the restraints have been and will continue to be carefully tailored to permit the defendants the maximum benefit of profitable operation while maintaining the status quo. Thus, the costs of the

restraint, if any, are slight in comparison with the hardship that plaintiff would suffer from dissolution of the restraints. The balance of hardships tips decidedly in plaintiff's favor.

## IV. *Legal Defenses*

■ The defendants invoke the act-of-state doctrine and *forum non conveniens,* contending that these defenses will ultimately require dismissal and now require that the restraints be lifted. It is indeed possible that the act-of-state doctrine may eventually prove an obstacle to the plaintiff's case. But the applicability of the doctrine is not demonstrated on the present record. Defendants have made no showing that the acts alleged against Ferdinand Marcos, much less Imelda Marcos, would necessarily be protected from United States court adjudication. The doctrine generally does not protect foreign officials from adjudication as to personal acts of conversion that do not purport to be done in the name of the foreign sovereign.

As the doctrine was recently explained by the Court of Appeals: "If adjudication would embarrass or hinder the executive in the realm of foreign relations, the court should refrain from inquiring into the validity of the foreign state's act." *Allied Bank Int'l v. Banco Credito Agricola,* 757 F.2d 516, 521 (2d Cir.1985). This court has received neither an indication from the Department of State, nor even argument from the defendants, that this government's conduct of its foreign policy would be hindered or affected by judicial consideration of plaintiff's claims. Unlike the usual case of application of the doctrine in which the foreign state defends its acts against U.S. court intrusion, *see, e.g., Banco Nacional de Cuba v. Sabbatino,* 376 U.S. 398, 84 S.Ct. 923, 11 L.Ed.2d 804 (1964); *Underhill v. Hernandez,* 168 U.S. 250, 18 S.Ct. 83, 42 L.Ed. 456 (1897), here, by contrast, it is the foreign government that seeks adjudication in our courts. There is no effort to declare invalid acts asserted to be legal by a foreign state.

■ The act-of-state doctrine "demands a case-by-case analysis." *Allied Bank Int'l, supra,* at 521. On the incomplete record before the court at this stage, and bearing in mind the great hardship to the plaintiff of any dissolution of the restraints, the mere possibility that the doctrine may later prove a viable defense is not sufficient grounds to block the issuance of an otherwise appropriate preliminary injunction.

■ Defendants further contend that principles of *forum non conveniens* require dismissal, or denial of a preliminary injunction. The Supreme Court explains "the central purpose of any *forum non conveniens* inquiry is to ensure that the trial is convenient...." *Piper Aircraft v. Reyno,* 454 U.S. 235, 256, 102 S.Ct. 252, 266, 70 L.Ed.2d 419 (1981). While it is true that much of the evidence is to be found in the Philippines, the action focuses on New York properties and plaintiff's application for a New York receiver. Numerous pertinent financial documents are in New York. The likelihood of dismissal based on *forum non conveniens* is not sufficiently high to justify denying preliminary restraints necessary for plaintiff's protection. Indeed, even if the action were to be dismissed in favor of a parallel trial in the Philippines, such dismissal might await the Philippine Court having the opportunity to consider ordering similar preliminary restraints.

Defendants also have raised a defense based on the Court of Appeals' decision in *Republic of Iraq v. First National City Bank,* 353 F.2d 47 (2d Cir.1965). In *Republic of Iraq* the court affirmed federal jurisdiction and dismissed the action on the grounds that an Iraqi decree confiscating the properties of the deposed sovereign was inconsistent with United States law and would not be enforced in United States courts. Defendants' proposition that the *Republic of Iraq* case requires dismissal of the instant action is at best premature. The Philippine government has done nothing inconsistent with the policies or laws of the United States.

The record holders of the Manhattan Properties raise the additional defenses that President Marcos is immune from suit under Philippine law (in particular a 1981 amendment to the Philippine Constitution) and is further protected by the Foreign Sovereign Immunity Act of 1976, 28 U.S.C. §§ 1602 *et seq.* Without reaching the merits of these defenses, it is sufficient to say that Mr. Marcos has not appeared in this action, and that none of the appearing defendants is entitled to raise either defense on his behalf.

## CONCLUSION

I recognize that the evidence on which this opinion relies is susceptible of other conceivable interpretations, perhaps wholly consistent with innocent explanations. At present, however, no proofs have been submitted to rebut the inferences on which plaintiff relies. Indeed, as mentioned above, President and Mrs. Marcos as of this time are in default. It should be noted that a ruling on a preliminary injunction is not a fact finding. This opinion does not conclude that any facts have been established. It concludes only that the standards for issuance of a preliminary injunction have been satisfied. Plaintiff has amply shown "sufficiently serious questions going to the merits to make them a fair ground for litigation" together with irreparable harm and a balance of hardships tipping in its favor.

The preliminary injunction is granted on the same terms as the expiring temporary restraining order. Plaintiff is directed to post a bond of $3 million.

SO ORDERED.