**RUPALI BANK**

v.

**PROVIDENT NATIONAL BANK.**

**Civ. A. No. 72–1653.**

United States District Court,
E. D. Pennsylvania.

Sept. 22, 1975.

Robert F. O'Brien, Michael Kaplan, Camden, N. J., Saul I. Weinstein, New York City, for plaintiff.

John G. Harkins, Jr., Murray S. Levin, Philadelphia, Pa., for defendant.

## MEMORANDUM AND ORDER

CAHN, District Judge.

Plaintiff, Rupali Bank ("Rupali"), a Bangladesh banking company, seeks to recover the sum of $648,294.94 from defendant, Provident National Bank ("Provident"). The principal office of the Muslim Commercial Bank, Ltd., ("Muslim Bank") in Karachi, West Pakistan, made arrangements with Provident to collect and deposit in a dollar account the proceeds from certain export transactions. Rupali contends that the deposits with Provident were owned by the Muslim Bank's branch at Motijheel, Dacca, East Pakistan ("Motijheel Branch") and that the Bangladesh Banks Nationalisation Order, dated March 26, 1972, (the "Nationalisation Order") effectively expropriated those funds for the benefit of Rupali.

The case has been tried without a jury and, after considering a stipulation of facts, the oral testimony and documentary evidence, I make the following Findings of Fact:

1. Since 1956, Muslim Bank had its head office, principal place of business, corporate domicile and registered office in Karachi, West Pakistan.

2. Muslim Bank opened the Motijheel Branch in East Pakistan on June 15, 1966.

3. The Muslim Bank is a business entity organized under the statutory law of Pakistan and is the holder of a certificate of incorporation dated July 9, 1947.

4. From June 15, 1966, to December 16, 1971, the Muslim Bank exercised control over its Motijheel Branch including the approval of extension of credit in cases where the loans exceeded $1,000 unsecured and $2,500 secured.

5. The Muslim Bank required the Motijheel Branch to submit weekly statements pertaining to assets and liabilities, but these statements contained no entries for net worth.

6. The Motijheel Branch, prior to December 16, 1971, did not hold any separate charter or article of incorporation and was not a separate legal entity.

7. In early 1967, Muslim Bank's principal office in Karachi arranged with Provident to open a dollar account with Provident for the collection of export bills for jute drawn on Wilcox Industries, Inc., ("Wilcox") an importer located in the United States.

8. This dollar account was known and designated as "The Muslim Com-

mercial Bank, Ltd., Adamjee House, Mc-Leon Road, Karachi, Pakistan" account.

9. Muslim Bank directed Provident to credit the proceeds of export bills to that account.

10. Adamjee Jute Mills, Ltd., ("Adamjee") operated a jute processing mill in East Pakistan which has now become a separate nation known as Bangladesh.

11. During the period of July 18, to October 27, 1971, Adamjee forwarded 56 shipments of jute from the territory of East Pakistan to Wilcox.

12. For each shipment of jute, Adamjee financed the export transaction by borrowing from Muslim Bank the sum that would ultimately be collected from Wilcox, with delivery to the Muslim Bank of a documentary draft, including an ocean bill of lading, drawn upon Wilcox and payable to the order of the Muslim Bank.

13. These loans from the Muslim Bank to Adamjee were to be repaid by the proceeds from the export bills which were deposited to the account at Provident.

14. Adamjee delivered the export bills to Muslim Bank's Motijheel Branch which forwarded them to Provident for collection with the following instructions:

> "On realisation kindly credit the proceeds to our Head Office, Karachi account with you under advice to them and to us."

15. On or before November 24, 1971, Provident presented the export bills to Wilcox for acceptance.

16. Before December 1, 1971, all of the bills had been accepted by Wilcox and all the shipments of jute related to said bills had been delivered to United States ports.

17. The export bills were collected by Provident from Wilcox between December 1, 1971, and March 22, 1972, and the net proceeds of $648,294.94 were credited by Provident to the Muslim Bank's account.

18. Commencing in March, 1971, revolutionary foment existed in Bangladesh culminating in the fall of Dacca to Bangladesh forces on December 16, 1971.

19. Following December 16, 1971, the Bangladesh government appointed an administrator of the assets for those banks whose head offices were located in West Pakistan.

20. The Bangladesh Banks Nationalisation Order, which became effective March 26, 1972, purported to vest all assets of the Motijheel Branch in the plaintiff, Rupali.

21. All collections on the export bills were made by Provident prior to March 26, 1972, the date of the Nationalisation Order.

22. On or about January 10, 1972, Rupali issued instructions to Provident to dispose of the dollar account, which instructions Provident did not follow.

23. Prior to March 26, 1972, Provident placed the funds in the dollar account in a suspense account and after March 26, 1972, paid said funds to Muslim Bank after receiving an indemnity and hold-harmless agreement.

## DISCUSSION

An outline of Rupali's claim is necessary for an understanding of this matter. Rupali contends: the Motijheel Branch was and is an independent and separate entity; the assets of the Motijheel Branch have been expropriated under the Nationalisation Order which vests those assets in Rupali; it therefore has become the owner of the underlying debt of Adamjee which debt was owed to the Motijheel Branch; collections made by Provident were due to the Motijheel Branch as security for the underlying debt; the situs of the security for the underlying debt is in Bangladesh; the Nationalisation Order operates to confiscate the funds on deposit in Philadelphia because either the situs of the debt is the location of the creditor, or Provident is subject to the jurisdiction of

the courts of Bangladesh under the facts of this case; this court is bound to apply the act of state doctrine [1] to give effect to the Nationalisation Order's purported transfer of title to the funds collected by Provident by ordering their payment to Rupali; and in any event Provident was required to pay over the dollar account to the assignee of Rupali pursuant to the exercise of a power of attorney which is irrevocable.

■ I have found as a fact that the Motijheel Branch is not an independent entity and was a creature of the Muslim Bank. I have also found, and it is undisputed, that the dollar account was opened in the name of the Muslim Bank and designated as such on the records of Provident. The law of this forum [2] relies on a presumption that a deposit belongs to the person in whose name it is entered although such a presumption is rebuttable. *Egbert v. Payne*, 99 Pa. 239 (1882); *Patterson v. Marine Bank*, 130 Pa. 419, 18 A. 632 (1889), 9 C.J.S. *Banks and Banking* § 285.

■ Plaintiff, upon which the burden of proof rests initially, has failed to establish that the Motijheel Branch had any separate or independent right to the dollar account held by Provident in Philadelphia, and in addition has failed to rebut the presumption that said account is owned by the person in whose name the account stands. The testimony that the collections by Provident would eventually be credited by the Karachi office to the Motijheel Branch in rupees, although uncontroverted, does not substantiate any independent right of ownership in that dollar account by the Motijheel Branch in the absence of any proof that the Motijheel Branch was separately organized under the statutory laws of Pakistan.

Although plaintiff's syllogistic argument is defective because it has not met the burden of proof in respect to the ownership of the account and the alleged independent existence of the Motijheel Branch, there are other fatal flaws with the plaintiff's case. The plaintiff relies on *United States v. Belmont*, 301 U.S. 324, 57 S.Ct. 758, 81 L.Ed. 1134 (1937), and *United States v. Pink*, 315 U.S. 203, 62 S.Ct. 552, 86 L.Ed. 796 (1942), for the proposition that the situs of a debt is where the creditor is located and since the creditor was the Motijheel Branch, Bangladesh has jurisdiction to expropriate the debt in which event the act of state doctrine would preclude this court from reviewing whether the expropriation was violative of public policy. The *Belmont* and *Pink* cases must be restricted to the peculiar facts of those cases which involve the Litvinov Assignment.[3] In the absence of diplomatic arrangements, the cases of *Republic of Iraq v. First National City Bank*, 353 F.2d 47 (2d Cir. 1965) and *Menendez v. Saks and Co.*, 485 F.2d 1355 (2d Cir. 1973) *cert. granted sub nom. Alfred Dunhill of London, Inc. v. Republic of Cuba*, 416 U.S. 981, 94 S.Ct. 2382, 40 L.Ed.2d 758 (1974), are dispositive of this issue. Since no provision has been made to compensate Muslim Bank

---

1. The classic statement of the act of state doctrine is found in *Underhill v. Hernandez*, 168 U.S. 250, 252, 18 S.Ct. 83, 84, 42 L.Ed. 456 (1897):

    "Every sovereign State is bound to respect the independence of every other sovereign State, and the courts of one country will not sit in judgment on the acts of the government of another done within its own territory . . ."

2. Section 4-102(2) of the Uniform Commercial Code, 12A P.S. § 4-102(2) requires application of Pennsylvania law in determining the rights of the parties. Furthermore,

since the bank account was established in Pennsylvania and disbursement of the proceeds was to take place in Pennsylvania, the most significant contacts are related to Pennsylvania, and, therefore, the law of Pennsylvania applies. *Neville Chemical Co. v. Union Carbide Corp.*, 422 F.2d 1205 (3rd Cir.) *cert. denied* 400 U.S. 826, 91 S.Ct. 51, 27 L.Ed.2d 55 (1970).

3. Applicable excerpts from the Litvinov Assignment are set forth in the *Pink* case, *supra*, 315 U.S. at Pp. 212 and 213, 62 S.Ct. 552.

for the expropriation of its assets, the following statement in *Republic of Iraq, supra,* at page 51, becomes determinative:

> "Confiscation of the assets of a corporation has been said to be 'contrary to our public policy and shocking to our sense of justice,' . . ."

■ Since the dollar account was located in Philadelphia the act of state doctrine does not preclude this court from enforcing the public policy of the United States and the Commonwealth of Pennsylvania which is vehemently opposed to confiscation without compensation. Also, as noted above, there was no question in *Belmont* that a Russian corporation was the owner of the assets located in New York State. Here, I have found that the plaintiff was not the owner of the dollar account in Philadelphia.

Plaintiff further arges that dictum in *Menendez* requires this court to apply the act of state doctrine in favor of the plaintiff on the ground that Provident was subject to the jurisdiction. of Bangladesh courts at the time of the expropriation. In *Menendez,* the court stated:

> "For purposes of the act of state doctrine, a debt is not 'located' within a foreign state unless that state has the power to enforce or collect it . . .
>
> " . . . . In the absence of any showing that the [debtors] were present in Cuba or subject to the jurisdiction of Cuban courts at the time of the [nationalization] . . . no legal effect should be accorded to Cuba's purported confiscation of the [debts]." 485 F.2d at 1364, 1365.

In order to take advantage of the foregoing language, the plaintiff has called an expert witness, learned in the law of Pakistan and Bangladesh, who gave his opinion that under section 20(c) of the Code of Civil Procedure of 1908 the Bangladesh court would have jurisdiction over Provident [4] because the cause of action partially arose in Bangladesh. In contravention of this opinion, the defendant called an expert learned in the law of Pakistan who testified that in his opinion no jurisdiction over Provident existed in the Bangladesh courts under the civil code referred to by plaintiff's expert. Both experts referred to case and statutory law and copies of same were introduced into evidence.

Paragraph 20(c) of the Code of Civil Procedure of 1908 provides as follows:

> "*Other suits to be instituted where defendants reside or cause of action arises.* Subject to the limitations aforesaid, every suit shall be instituted in a Court within the local limits of whose jurisdiction:—
>
> "(c) the cause of action, wholly or in part, arises."

The concept of jurisdiction in Pakistan and Bangladesh is not dissimilar to American notions of jurisdiction. Actually, the law of Pakistan and Bangladesh is derived from the English common law. Plaintiff's expert could point to no specific case where in personam jurisdiction was exercised by a Pakistan or Bangladesh court over a foreign debtor where there were no other contacts between the debtor and Pakistan or Bangladesh, other than the debt itself.

Defendant's expert testified that there was a creditor-debtor relationship between Provident and Muslim Bank, that the relationship arose by acceptance of Provident in Philadelphia of the obligation to collect the export bills from Wilcox, that the debt was payable by Provident in Philadelphia, and that the cases referring to this question hold that the cause of action arises where the contract is made or broken or where performance is to take place. Since all of those contacts are Philadelphia, defendant's expert concluded that no part of the cause of action arose in Bangladesh, and,

---

4. The laws of Pakistan were made applicable in Bangladesh following December 16, 1971, by Proclamation of the Bangladesh government.

therefore, the Bangladesh courts lack in personam jurisdiction over Provident.

■ After a careful review of the statutes and cases involved and considering the direct and cross-examinations of the experts, I conclude that the Bangladesh courts would not have in personam jurisdiction over Provident in regard to the dollar account in Philadelphia. Therefore, the dictum in *Menendez* does not require the application of the act of state doctrine to this case to enforce the expropriation order.

■ Plaintiff also contends that Muslim Bank issued a power of attorney to certain employees of the Motijheel Branch and that pursuant to this power Provident was notified to dispose of the dollar account for the benefit of Rupali. Although Provident may have had a right to rely on such an instruction in the absence of knowledge that it was revoked, since it did not, the question is moot. Plaintiff argues that the power of attorney was irrevocable because it was coupled with an interest in that the holders were entitled to some kind of compensation from Muslim Bank. Plaintiff never definitely established the exact nature of this interest but, in any event, the interest of an agent in compensation ". . . does not support a claim of a power coupled with an interest which will bar revocation of the agency or power." *3 Am.Jur.2d Agency* § 64; *McMahan v. Burns*, 216 Pa. 448, 65 A. 806 (1907). The notice of termination of the agency relationship was received by Provident on or about December 31, 1971, which was prior to the instruction it received from Rupali on or about January 10, 1972. Also, under the law of Pakistan and Bangladesh an agent is not permitted to act contrary to the best interests of his principal (defendant's legal expert testified that such is the law), and, therefore, plaintiff is estopped from claiming that Provident should have followed instructions it issued to dispose of the dollar account. The rule is the same in Pennsylvania.

*Kribbs v. Jackson*, 387 Pa. 611, 129 A.2d 490 (1957).

I reach the following Conclusions of Law:

1. This court has subject matter jurisdiction pursuant to 28 U.S.C.A. § 1332(a) and in personam jurisdiction over the parties.

2. Under the law of Pakistan and under the law of Bangladesh the Motijheel Branch was not an independent entity and it did not, as a branch, have separate title to any of the assets lodged with it.

3. The dollar account in Provident was owned by Muslim Bank and not the Motijheel Branch.

4. The Nationalisation Order is ineffective to expropriate the dollar account held by Provident.

5. Under the law of Bangladesh, the courts of Bangladesh could not obtain in personam jurisdiction over Provident in this case in that no part of the within cause of action arose in Bangladesh, and there is no other basis for the imposition of in personam jurisdiction over Provident.

6. The Muslim Bank validly revoked the power of attorney it had previously issued to certain employees of the Motijheel Branch prior to the exercise of that power of attorney.

7. Judgment will be entered for the defendant.