(Slip Opinion)

# Application of the Anti-Terrorism Act of 1987 to Diplomatic Visit of Palestinian Delegation

Section 1003(2) of the Anti-Terrorism Act of 1987, which prohibits the expenditure of funds from the Palestine Liberation Organization in the United States to further the PLO's interests, is unconstitutional to the extent it prevents the exercise of the President's Article II authorities to receive public ministers and to determine the manner in which the Executive engages in diplomacy with foreign representatives. The ATA therefore does not prevent PLO representatives invited by the State Department to Washington, D.C., from spending PLO funds to attend diplomatic meetings with Executive Branch officials, including for expenses that are necessary incidents to those meetings.

October 28, 2022

MEMORANDUM OPINION FOR THE ACTING LEGAL ADVISER
DEPARTMENT OF STATE

As part of the United States' efforts to secure a lasting peace in the Middle East, President Biden met in Bethlehem with President Abbas of the Palestinian Authority ("PA") in July 2022. During that meeting, the President reaffirmed the commitment of the United States to continuing efforts to bring Israel and the Palestinians together. Officials of the PA and of the Palestine Liberation Organization ("PLO") thereafter renewed requests to receive U.S. officials in Ramallah; to engage with our diplomats based in Ramallah; and to meet with United States leaders in Washington, D.C.[1] The State Department determined that a visit to the U.S. capital of a Palestinian delegation that includes PLO officials, for diplomatic meetings with Executive Branch officials on matters to include counter-terrorism efforts and other objectives, would significantly facili-

---

[1] Although PA President Abbas also serves as Chairman of the PLO, the PA and the PLO are legally distinct entities. Since the Oslo Accords in the 1990s, the United States has recognized the PLO as the international representative of the Palestinian people, including for purposes of negotiations with Israel and others concerning establishment of a Palestinian State. The PA was established as an interim self-government authority through a series of agreements negotiated between Israel and the PLO pursuant to the first of the Oslo Accords, the Declaration of Principles on Interim Self-Government Arrangements, Sept. 13, 1993, 32 I.L.M. 1525, and culminating in the Interim Agreement on the West Bank and the Gaza Strip, Sept. 28, 1995, 36 I.L.M. 551 (1997), better known as "Oslo II" or the "Interim Agreement."

tate diplomatic engagement between the United States and the PLO and thereby help to advance the important objectives the President has identified.

Before the State Department extended an invitation to the PLO for such a visit, your office contacted the Department of Justice concerning the possible application of the Anti-Terrorism Act of 1987 ("ATA"), Pub. L. No. 100-204, tit. X, 101 Stat. 1331, 1406, codified at 22 U.S.C. §§ 5201–5203, to expenditures that PLO representatives might make while they would be in the United States for the planned diplomatic engagements.

We advised you that in light of the President's exclusive Article II authorities to receive foreign ministers and to determine the manner in which the Executive Branch engages in diplomatic communications with foreign representatives, expenditures of PLO funds by the PLO delegation for meetings in Washington between that delegation and Executive Branch officials would be legal, notwithstanding the ATA. We further advised that a reasonable expenditure of PLO funds on activities that are necessary incidents of such diplomatic engagements, such as lodging, food, and transportation for the delegation during its visit would also be lawful.

Thereafter, the State Department, through the Assistant Secretary of State for Near Eastern Affairs, and after consultation with the staff of the National Security Council, invited a Palestinian delegation that included PLO officials to Washington solely for the purpose of meeting with State Department and other Executive Branch officials from October 2–5, 2022.[2] The State Department explained to the invitees that expenditures of the sort described above would not be unlawful during their visit but instructed the PLO representatives not to spend PLO funds to engage in other activities to further the PLO's interests that were not incidental to the meeting with Executive Branch officials, such as attending other

---

[2] The Immigration and Nationality Act makes PLO officials presumptively inadmissible for purposes of entry into the United States. 8 U.S.C. § 1182(a)(3)(B)(i)(I)–(II) (declaring "inadmissible" "[a]ny alien who . . . has engaged in a terrorist activity [or who] a consular officer, the Attorney General, or the Secretary of Homeland Security knows, or has reasonable ground to believe, is engaged in . . . any terrorist activity"); id. § 1182(a)(3)(B)(i) ("An alien who is an officer, official, representative, or spokesman of the Palestine Liberation Organization is considered, for purposes of this chapter, to be engaged in a terrorist activity."). Your office informed us, however, that the State Department would follow standard procedures, pursuant to 8 U.S.C. § 1182(d)(3)(A)(i), to request a waiver of the inadmissibility restriction as may be necessary to grant temporary nonimmigrant visas to members of the PLO delegation.

meetings and holding public events. This opinion memorializes the basis for our earlier advice to you regarding the application of the ATA to the PLO delegation's diplomatic visit to Washington. Although our analysis differs in certain respects from that contained in a 2018 opinion of this Office concerning the application of the ATA to the maintenance of the PLO's Washington office, *see Statutory Restrictions on the PLO's Washington Office*, 42 Op. O.L.C. __ (Sept. 11, 2018) ("*PLO Office*"), we nevertheless conclude that section 1003 of the ATA may not constitutionally be applied to preclude the sorts of PLO expenditures you have described—a conclusion that is consistent with the advice we provided to your office in 2018 concerning similar expenditures.

## I.

Congress enacted the ATA in 1987 to implement its "determin[ation] that the PLO and its affiliates are a terrorist organization and a threat to the interests of the United States, its allies, and to international law *and should not benefit from operating in the United States*." 22 U.S.C. § 5201(b) (emphasis added). Section 1003 of the ATA limits PLO activity within the United States by making it "unlawful" to do one or more of three things, "if the purpose be to further the interests of the Palestine Liberation Organization or any of its constituent groups, any successor to any of those, or any agents thereof":

> (1) to receive anything of value except informational material from the PLO or any of its constituent groups, any successor thereto, or any agents thereof;

> (2) to expend funds from the PLO or any of its constituent groups, any successor thereto, or any agents thereof; or

> (3) notwithstanding any provision of law to the contrary, to establish or maintain an office, headquarters, premises, or other facilities or establishments within the jurisdiction of the United States at the behest or direction of, or with funds provided by the Palestine Liberation Organization or any of its constituent groups, any successor to any of those, or any agents thereof.

*Id.* § 5202. Congress has authorized the President to waive these prohibitions upon certification that certain conditions are met, and Presidents

(and Secretaries of State, by delegation) routinely exercised such waiver authority from 1994 until November 2017. *See PLO Office* at *4–6. In November 2017, however, the Secretary of State declined to make the required factual determinations that are necessary in order to exercise the statutory waiver authority, one of which would be that the Palestinians "had not taken any actions to prompt the International Criminal Court ('ICC') to investigate alleged crimes committed by Israeli nationals against Palestinians," which was then (and continues to be) a statutory condition for a waiver. *Id.* at *6.[3] The waiver authority has not been exercised since that time. Accordingly, the prohibitions of section 1003 are currently in effect insofar as they are constitutional.

The proposed visit of PLO representatives to Washington did not entail the reopening of the Washington office of the PLO or the opening of another facility within the United States.[4] Section 1003(3) of the ATA is therefore inapposite. In order to engage in diplomatic activities with the Executive Branch in Washington, however, PLO representatives presumably would have to "expend funds from the PLO" for the "purpose" of "further[ing] the interests of the Palestine Liberation Organization," in violation of section 1003(2).[5] Enforcing that prohibition thus would make it practically impossible for Executive Branch representatives to meet with PLO representatives in Washington. The question on which we

---

[3] The most recent waiver authority is contained in the Department of State, Foreign Operations, and Related Programs Appropriations Act, 2022, Pub. L. No. 117-103, div. K, tit. VII, § 7041(l)(3)(B), 136 Stat. 49, 564, 641.

[4] The PLO closed its Washington, D.C. office in 2018. *See PLO Office* at *8. The PLO has also maintained a mission as a United Nations observer in New York City since 1974. In 1988, a district court held that ATA section 1003(3) did not require closing that mission because the ATA should not be read to abrogate the United States' treaty obligations under sections 11–13 of the Agreement Between the United Nations and the United States Regarding the Headquarters of the United Nations, 11 U.N.T.S. 11, 20–24, 22 U.S.C. § 287 note (1982). *United States v. Palestine Liberation Org.*, 695 F. Supp. 1456, 1464–71 (S.D.N.Y. 1988). The United States did not appeal that ruling. Accordingly, the PLO has maintained its United Nations mission for several decades notwithstanding section 1003 of the ATA.

[5] Receipt of such funds (or anything of value) in the United States by those persons or others for the purpose of furthering the PLO's interests might also implicate section 1003(1). To the extent section 1003(1) would apply in a manner that would effectively prevent the PLO's diplomatic visit, our analysis below with respect to section 1003(2) would carry over to that other subsection, as well.

advised you orally is whether this statutory interference with the Executive's diplomatic engagements would be constitutional and therefore enforceable.[6]

## II.

As the Supreme Court has emphasized, "[t]he Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue. It is not for the President alone to determine the whole content of the Nation's foreign policy." *Zivotofsky v. Kerry*, 576 U.S. 1, 21 (2015) (internal citations omitted). "In a world that is ever more compressed and interdependent," the Court explained, "it is essential the congressional role in foreign affairs be understood and respected. For it is Congress that makes laws, and in countless ways its laws will and should shape the Nation's course." *Id.*

We have similarly acknowledged that "Congress quite clearly possesses significant Article I powers in the area of foreign affairs, including with respect to questions of war and neutrality, commerce and trade with other nations, foreign aid, and immigration." *Legislation Prohibiting Spending for Delegations to U.N. Agencies Chaired by Countries That Support International Terrorism*, 33 Op. O.L.C. 221, 225–26 (2009) ("*Delegations to U.N. Agencies*"). In particular, and as we recognized in our 2018 opinion about the ATA and PLO activities in the United States, *PLO Office* at *9, Congress has authority to regulate commerce within the United States, including commerce of foreign visitors. *See* U.S. Const. art. I, § 8, cl. 3 ("The Congress shall have Power . . . [t]o regulate Commerce with foreign Nations, and among the several States[.]"). As a result, "Congress has the authority under Article I to regulate any nondiplomatic activities conducted by the PLO," at least as long as "those measures [do] not invade the President's exclusive authority over diplomacy." *PLO Office*

---

[6] Section 1004(a) of the ATA provides that the Attorney General "shall take the necessary steps and institute the necessary legal action to effectuate the policies and provisions of this chapter," 22 U.S.C. § 5203(a), and section 1004(b), in turn, provides that "[a]ny district court of the United States for a district in which a violation of this chapter occurs shall have authority, upon petition of relief by the Attorney General, to grant injunctive and such other equitable relief as it shall deem necessary to enforce the provisions of this chapter," *id.* § 5203(b).

at *24. Section 1003 of the ATA therefore is constitutional in many of its applications.

As we explain below, however, section 1003(2) of the ATA would impermissibly infringe on exclusive presidential authorities to the extent it precluded the expenditure of PLO funds necessary to facilitate meetings between PLO representatives and Executive Branch officials in Washington. Therefore it would be unconstitutional to apply section 1003(2) to prevent such expenditures.

Article II grants the President certain significant, exclusive authorities relating to foreign affairs. In particular, the President has authority to "receive Ambassadors and other public Ministers," U.S. Const. art. II, § 3, and to "make Treaties, provided two thirds of the Senators present concur," *id.* art. II, § 2, cl. 2. From these textual allocations of authority as well as the structure of Article II, courts have recognized certain derivative Executive powers, including "the authority to acknowledge, in a formal sense, the legitimacy of other states and governments, including their territorial bounds." *Zivotofsky*, 576 U.S. at 17. The President also "has the power to open diplomatic channels simply by engaging in direct diplomacy with foreign heads of state and their ministers." *Id.* at 13–14.

In addition, the Executive Branch has long maintained that the President possesses exclusive authority to determine "the form *and manner* in which the Executive engages in diplomacy" with foreign actors. *Delegations to U.N. Agencies*, 33 Op. O.L.C. at 227 (emphasis added). And we have further opined that this exclusive authority includes the power to determine the location of diplomatic relations, at least where the Executive concludes that a particular "venue at which diplomatic relations occur is itself . . . diplomatically significant." *Bill to Relocate United States Embassy from Tel Aviv to Jerusalem*, 19 Op. O.L.C. 123, 125 (1995).[7]

We acknowledge that in *Zivotofsky* the Court declined to endorse the Government's suggestion that "the President has 'exclusive authority to

---

[7] In our 1995 opinion, we wrote that "Congress may not impose on the President its own foreign policy judgments as to the particular sites at which the United States' diplomatic relations are to take place." *Bill to Relocate United States Embassy from Tel Aviv to Jerusalem*, 19 Op. O.L.C at 125. We have no occasion to revisit that categorical proposition here because, as we explain below, it is sufficient for present purposes to conclude that Congress may not effectively preclude such engagements in the Nation's capital where the Executive has determined that that location would be diplomatically significant.

conduct diplomatic relations.'" 576 U.S. at 19 (quoting Brief for the Respondent at 18).[8] Moreover, Congress has enacted many statutes purporting to direct the conduct of Executive Branch diplomatic engagements, often without Executive Branch objection. *See* Jean Galbraith, *The Runaway Presidential Power Over Diplomacy*, 108 Va. L. Rev. 81, 100–02, 104–05 (2022). Nevertheless, the Executive Branch's consistent view for several decades has been that the President's authority to determine the form and manner of diplomacy is indefeasible by statute, *see Delegations to U.N. Agencies*, 33 Op. O.L.C. at 231–33, and that position finds some support in the Nation's early history and in Executive Branch practice early in the 20th century, *id.* at 227–31; *see also Zivotofsky*, 576 U.S. at 21 (explaining that although "it is . . . the Legislative Branch, not the Executive Branch, that makes the law," "[t]he President does have a unique role in communicating with foreign governments"). Whatever the possible limits of that principle might be, it surely has its greatest force with respect to the President's decision to engage in diplomacy with foreign representatives in our Nation's capital, which is part and parcel of the President's authority to "receive Ambassadors and other public Ministers." U.S. Const. art. II, § 3.

As we discussed in our 2018 opinion concerning the application of the ATA to the maintenance of the PLO's Washington office, the President's

---

[8] In his dissenting opinion in *Zivotofsky*, Chief Justice Roberts wrote that the majority "purport[ed] to reject" the proposition that the President has the "exclusive authority to conduct diplomatic relations." 576 U.S. at 65 (Roberts, C.J., dissenting). We read the majority opinion differently. It is true that the Court did not accept the Government's suggestion of an exclusive Executive power to determine the substance of diplomatic engagements. And the Court unequivocally rejected the notion that the Constitution affords the President "'the bulk of foreign-affairs powers.'" *Id.* at 19 (quoting Brief for the Respondent at 16); *see id.* at 21 ("The Executive is not free from the ordinary controls and checks of Congress merely because foreign affairs are at issue. . . . It is not for the President alone to determine the whole content of the Nation's foreign policy."); *id.* at 20–21 (explaining that the decision in *United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936), is not to the contrary). The Court did not resolve, however, whether and under what circumstances, apart from questions of recognition, Congress may by statute regulate the manner in which the Executive engages in diplomatic interactions with foreign representatives. *See id.* at 20 ("A formulation broader than the rule that the President alone determines what nations to formally recognize as legitimate—and that he consequently controls his statements on matters of recognition—presents different issues and is unnecessary to the resolution of this case.").

constitutional prerogatives with respect to "receiving" ministers and engaging in diplomacy extend beyond Executive Branch interactions with recognized nation-states to engagements with "foreign political organizations, such as the PLO." *PLO Office* at \*16. To determine whether to recognize a prospective governmental entity as the legitimate sovereign authority of a state, the President must be able to engage in negotiations with that entity, including to reach agreements with it as a precondition of recognition. *See United States v. Belmont*, 301 U.S. 324, 330 (1937) (declaring it "within the competence of the President" to have negotiated with the Soviet Union, precedent to U.S. recognition of that State, an assignment of Russian claims against U.S. nationals to the United States, and giving legal effect to that assignment); *see generally PLO Office* at \*16–20 (discussing past examples of diplomatic interactions with entities other than recognized governments). Accordingly, the Executive's recognition power "necessarily subsumes within itself the power to withhold or deny recognition, to determine the conditions on which recognition will be accorded, and to define the nature and extent of diplomatic contacts with an as-yet unrecognized government." *Section 609 of the FY 1996 Omnibus Appropriations Act*, 20 Op. O.L.C. 189, 194 (1996).

We recognize that section 1003 does not directly prohibit the Executive from receiving PLO "Ministers"[9] or from engaging in diplomatic discussions with PLO representatives. It leaves open alternative channels of communication—for example, it has not prevented Executive Branch officials from meeting with Palestinian representatives on the West Bank. Section 1003 does, however, have an indirect effect upon such exclusive Executive functions in that it would effectively preclude diplomatic meetings in the Nation's capital (and elsewhere in the United States). The question is whether that indirect effect impermissibly limits the President's Article II authorities.

The Supreme Court indicated in *Zivotofsky* that the pertinent inquiry with respect to such indirect effects is whether the application of the statute in question "'prevents the Executive Branch from accomplishing its constitutionally assigned functions.'" 576 U.S. at 28–29 (quoting

---

[9] As we noted in 2018, on the rare occasions when Congress sought to bar the entry of foreign representatives into the United States, Presidents have regularly objected. *PLO Office* at \*14.

*Nixon v. Adm'r of Gen. Servs.*, 433 U.S. 425, 443 (1977)). In *Zivotofsky*, Congress had enacted a law providing that upon the request of a U.S. citizen born in Jerusalem, the Secretary of State had to designate that person's place of birth as "Jerusalem, Israel" on his or her U.S. passport, even though the President had declined to recognize that Israel had sovereignty over Jerusalem. The Court acknowledged "that Congress has substantial authority over passports." *Id.* at 31. Yet the Court held that the passport requirement at issue there violated the President's exclusive authority to recognize the territorial bounds of foreign states because it had the practical effect of mandating "that the Executive contradict his prior recognition determination in an official document issued by the Secretary of State," *id.* at 30, and thereby prevented the Executive from "speaking with one voice . . . in conducting foreign relations," *id.*

Because the PLO officials invited to the United States for the diplomatic engagements at issue here would almost certainly have to expend PLO funds "to further the [PLO's] interests," strict application of section 1003 would effectively have precluded PLO representatives from meeting with Executive Branch officials in Washington. It therefore would have obstructed the President in exercising the exclusive authorities described above, including the authority to determine which foreign "Ministers" to "receive" in our Nation's capital and the authority to determine the manner—in particular, the location—of the Executive's diplomatic engagements with international representatives.

The interference would be clearest with respect to the President's authority to "receive" foreign ministers, because the President for all practical purposes could not "receive" a PLO delegation anywhere in the United States if section 1003(2) were applied according to its terms.

Moreover, with respect to the President's authority to determine the manner of diplomatic communications, application of the ATA to preclude the expenditures in question would, in practical effect, preclude the Executive from being able to engage in diplomatic discussions in our Nation's capital, which is not only the natural situs of the President's "recei[pt]" of foreign "Ministers" but also a location that the State Department has determined is most conducive for such conversations and is therefore "diplomatically significant." *Bill to Relocate United States Embassy from Tel Aviv to Jerusalem*, 19 Op. O.L.C. at 125. Your office has explained to us that states often invite foreign delegations to their

capitals in order to facilitate open dialogue and to provide a visible symbol of the importance that is placed on a bilateral relationship. Meetings with PLO representatives in Washington are particularly important both symbolically and substantively, your office has explained, because the United States has not recognized a Palestinian State, has closed the Washington office of the PLO that otherwise served as the locus for engagement, and is striving to reestablish relationships to advance our foreign policy and security goals. Your office informed us that the State Department has assessed that such meetings would be necessary to discourage unilateral Palestinian actions in international fora to advance their claims for statehood, and to reinforce the message that the United States' willingness and ability to work with Palestinian representatives depends upon their continued commitment to non-violence and countering terrorism; to the cessation of the practice of making payments to individuals imprisoned for acts of terrorism and to the families of individuals who died committing acts of terrorism; and to facilitating settlement of the claims of U.S. victims of terrorism.

It thus does not matter that President Biden was previously able to meet with President Abbas in Bethlehem, or that U.S. officials could make further diplomatic trips to the West Bank to discuss these same subjects without implicating the ATA. The Executive may reasonably assess that being prevented from hosting the PLO delegation in Washington would seriously impair the President's diplomatic efforts. Accordingly, section 1003 may not constitutionally be applied in a manner that effectively prevents such a visit by prohibiting the invited PLO representatives from making a reasonable expenditure of PLO funds on activities that are necessary incidents of such diplomatic engagements with representatives from the Executive Branch, such as lodging, food, and transportation for the delegation during its visit. "Just as the President could not conduct diplomacy abroad without the ability to make 'expenditures [necessary] for preparation, support, and facilitation of diplomatic discussion,' depriving foreign representatives of the ability to perform these basic functions would prevent them from operating in our country" during a diplomatic visit. *PLO Office* at *23 (internal citation omitted).

### III.

Our conclusion regarding the lawfulness of such expenditures is consistent with the advice we provided to your office in 2018 concerning similar expenditures. The analysis we set forth above, however, differs in certain respects from that in our 2018 opinion. The 2018 opinion declared broadly that "[t]he President's foreign-affairs authorities . . . give him exclusive control over the activities of foreign representatives in the United States," including "the sole authority to decide" not only which foreign representatives to receive, but also "what activities they may undertake" while they are in the United States. *PLO Office* at *14–15; *see also id.* at *2 (asserting that "the President has the exclusive authority to receive foreign diplomatic agents in the United States *and to determine the conditions under which they may operate*" (emphasis added)). If these unconditional statements were correct, then presumably the President could permit the PLO representatives to expend PLO funds to do virtually anything they wish to advance PLO interests while they are in the United States, unencumbered by section 1003.

Upon further reflection, we conclude that such broad statements in our 2018 opinion are inconsistent with the Supreme Court's rationale in *Zivotofsky*. The Court in that case indicated that Congress could enact a law that has an incidental effect on the President's exercise of exclusive Article II functions so long as the law does not "'prevent[] the Executive Branch from accomplishing its constitutionally assigned functions.'" 576 U.S. at 28–29 (quoting *Nixon*, 433 U.S. at 443). To underscore the point, the Court noted that Congress could, for instance, enact an embargo against a nation that the President has recognized, or even declare war against it, *id.* at 30, despite the obvious impact that such actions would have on the objectives underlying the President's recognition decision. As a general matter, then, Congress can enact laws that might make it more difficult to achieve the substantive objectives of the President's diplomatic efforts, even if it cannot pass laws that effectively preclude the diplomatic engagements themselves.

At one point, our 2018 opinion appeared to acknowledge as much: It stated that Congress may generally "regulate any nondiplomatic activities conducted by the PLO" in the United States, *PLO Office* at *24, even though such regulation might mean that PLO diplomats would be preclud-

11

ed from doing what most other diplomats have been free to do while on missions to the United States. We agree with that statement. We believe, however, that some of the broader statements in the 2018 opinion, which appear to be in tension with the principle set forth in *Zivotofsky* that Congress may exercise its textual authorities in ways that have impact on the President's conduct of diplomacy—namely, that the President has "exclusive control over the activities of foreign representatives in the United States," including "the sole authority to decide . . . what activities they may undertake" while they are in the United States, *id.* at *14–15— are overstated.

Nevertheless, we continue to agree with the conclusion in our 2018 opinion that Congress could not by statute effectively preclude "specific activities that the State Department identifie[s] [as] necessary incidents of engaging the PLO in diplomatic contact with the United States." *Id.* at *21. For example, PLO representatives in the United States may communicate with PLO leadership abroad, even using PLO funds, because "[t]here would be few surer ways of thwarting the President's diplomatic efforts than to bar foreign representatives from reporting on developments within the United States." *Id.* at *21–22. Likewise, the ATA may not constitutionally be implemented to preclude the visiting PLO representatives from using PLO funds in a reasonable manner to subsidize other nondiplomatic activities that are necessary incidents of such diplomatic engagements with representatives from the Executive Branch. For example, we believe it was reasonable for the State Department to conclude that the PLO delegation had to be able to expend PLO funds to pay for such lodging, food, and transportation in the Washington area—even on the assumption that such expenditures would be made for the purpose of "further[ing] the interests of the Palestine Liberation Organization," 22 U.S.C. § 5202[10]—if such expenditures were reasonably necessary to enable those representatives to attend diplomatic meetings with Executive officials in Washington. *Accord PLO Office* at *22–23 (reasoning that "[l]ogistical and financial services provided to support PLO representatives' official trips to meet with high-level U.S. officials are also necessary incidents of diplomacy" because "[w]ithout such support, those diplomatic trips might not happen," and that, "[f]or similar reasons, finan-

---

[10] The ATA does not prohibit expenditures that are not made for that purpose.

cial and administrative activities related to diplomatic efforts, such as maintaining bank accounts and paying bills, are necessary incidents of diplomacy" that Congress could not prohibit). Accordingly, we advised you that the application of the ATA to prohibit these expenditures would be unconstitutional.[11]

CHRISTOPHER H. SCHROEDER
*Assistant Attorney General*
*Office of Legal Counsel*

---

[11] In our 2018 opinion, we concluded that PLO representatives could expend PLO funds in the United States to engage in "various forms of public diplomacy—namely, 'outreach to Palestinian-Americans, Palestinians in the United States, or interested Americans on matters relevant to the Palestinian community,'" *PLO Office* at *22, on the ground that such activities have historically been "typical and accepted incident[s] of diplomacy," *id.* However, even if host states sometimes (albeit presumably not always) permit foreign diplomats to engage in such activities while they are visiting on a diplomatic mission, that "typical and accepted" practice has occurred in the absence of statutory restrictions such as those found in ATA section 1003—a statute designed to deviate from the baseline norm precisely in order to prevent the PLO from "benefit[ting] from operating in the United States." 22 U.S.C. § 5201(b).

That said, we have no occasion here to consider whether and under what circumstances the ATA's restrictions on the use of PLO funds for such forms of PLO "public diplomacy" would effectively prevent the Executive from "'accomplishing [the President's] constitutionally assigned functions,'" *Zivotofsky*, 576 U.S. at 28–29 (quoting *Nixon*, 433 U.S. at 443), of receiving ministers and determining the manner of U.S. diplomacy with the PLO. Nor do we revisit here the question of the extent to which the expenditure restriction of section 1003(2) may constitutionally be applied to expenditures by PLO representatives who are residing in the United States in order to work in a PLO office or mission. The only question we had occasion to answer here was whether section 1003(2) could constitutionally be enforced to prohibit the expenditure of PLO funds necessary to facilitate the diplomatic engagements of the visiting PLO delegation with Executive Branch officials.